UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------

NADINE CALIXTE,

                        Plaintiff,

           v.

CAROLYN W. COLVIN
*Acting Commissioner, Social Security
Administration*,

                        Defendant.

--------------------------------------------------------------

NOT FOR PUBLICATION

**MEMORANDUM & ORDER**
14-CV-5654 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Nadine Calixte filed the above-captioned action seeking review of the denial of her application for Supplemental Security Income ("SSI") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The Commissioner moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, claiming that the decision of Administrative Law Judge John J. Barry (the "ALJ") is supported by substantial evidence and should be affirmed. (Comm'r Not. of Mot. for J. on Pleadings, Docket Entry No. 19; Comm'r Mem. in Support of Mot. for J. on the Pleadings ("Comm'r Mem."), Docket Entry No. 20.) Plaintiff cross-moves for judgment on the pleadings. (Pl. Not. of Cross-Mot. for J. on Pleadings, Docket Entry No. 21; Pl. Mem. in Support of Cross-Mot. for J. on the Pleadings ("Pl. Mem."), Docket Entry No. 22.) Plaintiff argues that the evidence in the record demonstrates that Plaintiff was disabled and the ALJ erred in (1) failing to list post-traumatic stress disorder, trichotillomania and "self-harm" among Plaintiff's severe impairments at step two of the sequential analysis, (Pl. Mem. 24), (2) failing to consider any evidence from Arbor WeCare, (*id.* at 17–20), (3) failing to provide "good reasons" for according only some weight to the opinion of Dr. Vanessa Caskey, Plaintiff's treating

physician, (*id.* at 26–28), (4) relying on the medical expert testimony of Dr. Chufameka Efobi, (*id.* at 20–23), (5) according significant weight to an undated and unsigned form completed by Outreach Project, (*id.* at 25), and (6) according significant weight to the opinion of Dr. P. Kudler, the consultative examiner, (*id.* at 23). For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is denied and Plaintiff's cross-motion for judgment on the pleadings is granted.

## I. Background

Plaintiff is a forty-year-old woman with a high school education. (R. 187, 229.) Plaintiff last worked in 2009 as a self-employed taxi driver.[1] (R. 32.) On May 3, 2011, Plaintiff applied for SSI, alleging that she was disabled due to major depressive disorder, hemorrhoids, migraine headaches and alcohol abuse in early remission, with a disability onset date of December 1, 2009. (R. 187–93, 210, 224.) After applying for SSI, Plaintiff also alleged that she was disabled due to post traumatic stress syndrome. (R. 35.) Plaintiff's application was denied. (R. 82, 85–95.) Plaintiff requested an administrative hearing, which was held on November 26, 2012. (R. 26, 97–99.) By decision dated April 2, 2013, the ALJ found that Plaintiff was not disabled and denied Plaintiff's application. (R. 9–21.) On July 28, 2014, the Appeals Council denied review of the ALJ's decision. (R. 1–5.)

### a. Plaintiff's testimony

During the November 26, 2012 hearing, Plaintiff testified that she was disabled due to her major depressive disorder, post-traumatic stress disorder ("PTSD") and alcoholism. (R. 35–36.)

---

[1] In her disability report, Plaintiff indicated that she was last employed in 2004 and, during the November 26, 2012 hearing, Plaintiff testified that she worked as an office manager at a medical claims firm in 2004. (R. 33, 229.) However, Plaintiff also testified at the hearing that, following the office manager position, she worked as a self-employed taxi driver "sporadically" for "a couple of years" until 2009. (R. 32.)

For over a year, Plaintiff had been in treatment with psychologist Dr. Vanessa Caskey, Psy.D., and psychiatrist Dr. Ilse Rosenberg of the Bleuler Psychotherapy Center. (R. 35–36.) As of the date of the hearing, Plaintiff was not seeing any doctors other than Drs. Caskey and Rosenberg. (R. 36.) Plaintiff was seeing Dr. Caskey one time per week. (R. 40.) Plaintiff was also attending Alcoholics Anonymous ("AA") meetings one time per week, although she used to attend AA meetings "a few times a week." (R. 42.) Plaintiff was taking the following medications on a daily basis: Wellbutrin, Celexa and Seroquel. (R. 36.) Plaintiff had not been hospitalized in the past year and had never been hospitalized for a psychiatric condition. (R. 36.) Plaintiff did not have any problems walking, standing or sitting. (R. 41.)

With respect to her daily routine, Plaintiff rarely cooked and did not wash dishes because she had a dishwasher. (R. 36–37.) She went grocery shopping one to two times per week and cleaned her apartment. (R. 37.) Plaintiff also cared for her son, who was approximately two years old at the time of the hearing.[2] (R. 37.) Plaintiff's son did not attend school and spent the entire day with Plaintiff, and caring for him entailed feeding, washing and dressing him. (R. 37.) Plaintiff woke up each day at around 9:00 AM and she would get up about an hour later "because Seroquel le[ft] [her] very groggy" and she needed to "wake up slowly so [that she] d[id not] pass out." (R. 37–38.) Plaintiff would then prepare breakfast for her son. (R. 38.) After Plaintiff's son had eaten, he would watch television until 1:00 PM, when Plaintiff would prepare lunch for him. (R. 38.) Plaintiff's son would take a nap at around 2:30 PM and, after "put[ting] him down for a nap," Plaintiff would "start to cut [herself and she would] . . . spend a couple of hours while

---

[2] The Court's determination as to the approximate age of Plaintiff's son is based on a notation in a psychiatric evaluation form that is included in the record. (*See* R. 315–16 (Outreach Project Psychiatric Evaluation Form dated Jan. 4, 2011).) The form was completed on January 4, 2011 and it indicates that Plaintiff had given birth four and half months earlier. (R. 316.)

[her son was] sleeping cutting [herself] and pulling [her] hair out." (R. 38.) When Plaintiff's son woke up from his nap at around 4:00 or 5:00 PM, Plaintiff would feed him. (R. 38.) At around 6:00 PM, Plaintiff would make dinner for herself and her son. (R. 38.) Plaintiff would then bathe her son at around 8:00 PM, and put him to bed at around 9:00 PM. (R. 38.) Plaintiff would then take a bath, watch the news and "yank some more of [her] hair out and cut [herself] some more until [she went] to sleep." (R. 38.) Plaintiff "ke[pt] [herself] isolated," (R. 40), and only left the house to attend therapy appointments and go to the grocery store, (R. 40–41). One of Plaintiff's cousins lived in Brooklyn, New York, but Plaintiff "barely" saw her; the rest of Plaintiff's family lived outside of New York. (R. 48.)

Plaintiff began cutting herself and pulling her hair out when she stopped drinking in or around 2009. (R. 39.) Plaintiff had never harmed her son, and she described him as "the only thing that [she] really care[d] about." (R. 40.) When asked to describe the behavior she engaged in when cutting herself, Plaintiff explained that she would use a nail clipper to cut her fingers and toes until they bled. (R. 39.) Plaintiff also testified that she would pull the hair on her head out from the roots, which caused her to have boils. (R. 39.) Although Plaintiff was wearing a wig during the hearing, she removed it at the ALJ's request, and the ALJ noted that Plaintiff's "hairline [was] pushed back a bit and her hair [was] very thin on top and on the sides." (R. 39.) Plaintiff testified that, "when [she] hurt [herself] and . . . cause[d] [herself] to bleed," she would "feel better about [herself] for a little while" because she would have "drown[ed] [out] [her] depression for a little while." (R. 45.) Plaintiff also testified that, in engaging in such behavior, she was "making [herself] bleed [because she] deserve[d] to bleed for the life [she'd] led." (R. 45.) Plaintiff had suicidal thoughts "regular[ly]" and, when asked to describe what went through her mind when she had such thoughts, Plaintiff explained that she had "put together a

plan to down some Advils or Aleves, like a whole bottle[,] but [she] ha[dn't] done it. . . . because [she] worr[ied] about where [her] child [would] end up." (R. 44.)

While Drs. Caskey and Rosenberg had tried to help Plaintiff stop engaging in self-harming behavior by changing her medications and "get[ting] [her] to do different things," Plaintiff "always [came] back to hurting [herself] in some way," (R. 38–39), and the doctors' attempts to teach Plaintiff to use coping tools were "not helping," (R. 46). When asked if she thought the treatment she was receiving at the Bleuler Psychotherapy Center was helping her "a little bit[,] . . . a lot or a medium amount," Plaintiff testified that the treatment at Bleuler was helping her "a little." (R. 49.)

With respect to her alcoholism, Plaintiff began drinking in a way "that would be considered obsessive" at age fifteen or sixteen. (R. 42–43.) Plaintiff's father was an alcoholic and he died of complications from alcohol abuse. (R. 43.) Plaintiff received treatment from an outpatient detox program for alcoholism for nine months. (R. 48.) At the time of the hearing, Plaintiff had been sober for approximately six months since "slip[ing] in May" when she had a one-day relapse. (R. 42, 48.) Other than the one-day relapse in May of 2012, Plaintiff had not drunk alcohol "in an abusive manner" since she applied for SSI on May 3, 2011. (R. 48.)

When asked if she had been subjected to physical abuse, Plaintiff testified that she was physically abused by her father on a "daily" basis as a child, and that she and her sister were "punching bags." (R. 44.) While Plaintiff's mother was present during the abuse, she "never lifted a finger to help" Plaintiff and her sister. (R. 48.) As an adult, Plaintiff isolated herself and did not leave her apartment in order to avoid coming into contact with things that would trigger flashbacks to her abusive childhood. (R. 43–44.) Plaintiff was questioned about the abuse

during her childhood and she described specific instances of physical abuse and the related flashbacks she has experienced as an adult. (R. 44, 47–48.)

### b. Plaintiff's work history

During the November 26, 2012 hearing, Plaintiff testified that she last worked as a cab driver, which she did "sporadically" for a couple of years until 2009. (R. 32.) Before she stopped working as a cab driver, Plaintiff used the car she owned to pick up fares, and she worked between three to five days per week for four to five hour shifts. (R. 32.) Because Plaintiff was a self-employed driver, she set her own hours and, if she "didn't feel like going to work" on a given day, she "would just stay home and drink." (R. 46.) Plaintiff stopped doing this work when she was no longer able to afford car insurance and had to sell her car. (R. 33.) Before becoming a cab driver, Plaintiff worked as an office manager at a medical claims firm for "a couple of years," until around 2004 or 2005. (R. 33.) In this position, Plaintiff reported to one person but was "basically" her own boss and "had a lot of flexibility." (R. 47.) Before her office manager job, Plaintiff worked for the Salvation Army for a "brief" period in 2002 before being fired. (R. 33–34.) Plaintiff also worked as a temp through Robert Half Corporation. (R. 34.) In 2001, Plaintiff worked for Essex Communication in a customer service position, which involved interacting with customers over the telephone. (R. 34.)

### c. Medical Evidence

#### i. Arbor WeCare Records

Plaintiff has been receiving treatment and assistance from Arbor WeCare since February of 2010. (*See* R. 317–479.)

##### 1. February 1, 2010 Biopsychosocial Summary

On February 1, 2010, a biopsychosocial ("BPS") summary was prepared about Plaintiff.

(R. 319–33.)  As part of the BPS summary, information regarding Plaintiff's "mental health history" was collected from Plaintiff.  (R. 321.)  When asked if she had ever "thought about hurting or killing" herself, Plaintiff responded, "yes."  (R. 321.)  Plaintiff reported that, during the two weeks prior to the BPS, she felt "down, depressed or hopeless" on "several days"; she had "little interest or pleasure in doing things" on "several days"; she had "trouble falling or staying asleep, or sleeping too much" on "more than half the days"; she felt "tired or ha[d] little energy" "nearly everyday"; and she had "trouble concentrating on things, such as reading the newspaper or watching television" on "several days."  (R. 321.)  Plaintiff's "depression severity" was rated as "mild."  (R. 321.)  Plaintiff indicated that she had never received treatment for "nerves, depression, or an emotional problem" and was not then receiving mental health services.  (R. 321.)  Information regarding Plaintiff's "alcohol/drug abuse history" was also collected as part of the BPS.  (R. 324.)  Plaintiff denied having any history of substance abuse.  (R. 324.)

With respect to her daily activities, Plaintiff reported being able to wash dishes and clothes, "sweep/mop the floor," vacuum, shop for groceries, read, and bathe, dress, and groom herself. (R. 325.)  Plaintiff also indicated that she was able to travel independently by bus or train and had no travel limitations.  (R. 320.)

The BPS also involved a medical examination, and the results of Plaintiff's physical examination were normal.  (R. 329–330.)  Information regarding Plaintiff's "work limitations criteria" was also collected and, in a field marked "phase I preliminary restrictions," the notation "some restrictions" is written in response.  (R. 330.)  In a portion of the BPS completed by John George, an "Intake – Phase 1 Doctor," (R. 331), Plaintiff's "employment disposition" is listed as "temporarily unemployable" as Plaintiff was in need of "accommodations appropriate for high risk pregnancy," (R. 332).  The BPS comments indicate: "[Plaintiff] is in the first trimester of her

first pregnancy, with recurrent nausea and vomiting, poorly controlled by med[ication]. She has a high risk pregnancy. A wellness plan x 90 days is recommended." (R. 332.)

### 2. February 4, 2010 to April 27, 2010 records

A "Re-Exam Wellness Summary" was prepared for Plaintiff for the period between February 4, 2010 and April 27, 2010. (R. 410–421.) On April 27, 2010, Dr. Fazil Hussain reported that Plaintiff was "employable with minimal accommodations." (*See* R. 420–21.) Dr. Hussain indicated that he had reviewed an "OB/GYN physician wellness plan report dated 03/24/2010" and made the following comments in support of Plaintiff's employment disposition: "[Plaintiff] is recommended for a sedentary desk job with intermittent rest periods to allow for stretching movements. No heavy lifting or carrying greater than 10 pounds, repetitive bending, pulling, pushing, jumping, high impact activities, climbing, kneeling, squatting, prolonged walking or prolonged standing." (R. 420.)

### 3. December 9, 2010 "Phase II – Psychiatric Evaluation" by Dr. M. Gordon

On December 9, 2010, Dr. M. Gordon evaluated Plaintiff and completed a "Phase II – Psychiatric Evaluation" as part of the Arbor WeCare Program. (R. 334–41.) With respect to the "history of [Plaintiff's] present illness," Dr. Gordon wrote, "[d]epression from 2008, drinking, lost job, treated by PCP[3] since 8/10 childbirth, but no H/O[4] psychiatric treatment." (R. 334.) Dr. Gordon also noted that Plaintiff's symptoms included irritability, rages, indifference, tearfulness every one to two nights, "initial & middle insomnia with daytime

---

[3] The Court understands "PCP" to mean "primary care physician."

[4] The Court understands "H/O" to mean "history of."

fatigue," self-blame, decreased appetite with weight loss, passive suicidal ideas,[5] hopelessness, and social withdrawal. (R. 334.) As to Plaintiff's "psychiatric history," the notes indicate that Plaintiff had no history of psychiatric hospitalizations, suicide attempts, or auditory or visual hallucinations. (R. 335.)

Plaintiff reported "alcohol abuse from [her] teens to [her] recent pregnancy with slips since." (R. 335.) She reported no history of trauma and, with respect to her medical history, the notes state "migraines with photophobia." (R. 336.) Plaintiff's ability to do all of the following was rated as "poor": follow work rules, accept supervision, get along with co-workers, get along with the public, maintain attention, and adapt to change and to stressful situations. (R. 336.)

Dr. Gordon conducted a "mental status exam" of Plaintiff and rated Plaintiff's "appearance" as "neat," her "cooperativeness" as "cooperative," her "speech" as "normal," her "mood" as "depressed," her "activity" as "restless," her "affect" as "appropriate," her "form of thought" as "goal-directed," her "homicidality" as "none," and her "suicidality" as "ideations." (R. 337–38.) Dr. Gordon also noted that Plaintiff's suicidal ideas were "passive" and not "active." (R. 338.) As to Plaintiff's "cognitive exam," Plaintiff was "alert" and was able to register three objects. (R. 338.) Plaintiff was aware of her current City and State and the name of the clinic where the evaluation was conducted and the street on which it was located. (R. 338.) Plaintiff was also aware of the current month, year and day of the week, however she was not aware of the current date of the month. (R. 338–39.)

Dr. Gordon diagnosed Plaintiff as having "major depressive disorder, single episode,

---

[5] The relevant portion of Dr. Gordon's notes state "passive S ideas." (R. 334.) Given the subsequent reference to Plaintiff's "passive suicidal ideas" in Dr. Gordon's notes, (R. 338), the Court understands "passive S ideas" to mean "passive suicidal ideas."

severe, without psychotic features, alcohol abuse," and migraines. (R. 339.) Dr. Gordon also indicated that Plaintiff had "problems with social environment" and "problems with access to health care services" and reported a global assessment of functioning ("GAF") score of 45.[6] (R. 339–40.) Dr. Gordon recommended that Plaintiff receive "outpatient psychiatric treatment with anti-depressant medication" and "outpatient alcohol treatment." (R. 340.) With respect to her "capacity for employment," Dr. Gordon determined that Plaintiff was "temporarily disabled to work for 3 months." (R. 341.)

### 4. December 13, 2010 BPS evaluation by Dr. Myron Seidman

On May 2, 2011, Plaintiff's "case manager" at Arbor WeCare, Diane Pyram, completed a "function report" as part of Plaintiff's application for SSI. (R. 213–22.) According to the report, on December 13, 2010, Arbor WeCare physician Dr. Myron Seidman conducted a BPS evaluation of Plaintiff. (R. 221.) Dr. Seidman "found [Plaintiff] temporarily unable to work due to chronic psychiatric problems and referred [her] to the Wellness Program." (R. 221.) The report further states that "[b]ased on the BPS evaluation, [Plaintiff] ha[d] been diagnosed Major Depressive Disorder without psychotic features, alcohol abuse, migraine headaches, and hemorrhoids." (R. 221.)

### 5. December 13, 2010 "Initial Wellness Plan Summary"

On December 13, 2010, an "initial wellness plan summary" regarding Plaintiff was

---

[6] The GAF score is a numeric scale ranging from "0" (lowest functioning) through "100" (highest functioning). "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, at 32 (4th ed. 2000)). "A GAF in the range of 41 to 50 indicates '[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'" *Zabala v. Astrue*, 595 F.3d 402, 406 n.2 (2d Cir. 2010) (quoting *Diagnostic and Statistical Manual of Mental Disorders*, at 34)).

completed by Carolina Morris, Plaintiff's "Wellness Case Manager." (R. 443–50.) The information regarding Plaintiff's "alcohol/drug abuse history" indicates that the "period[] (in months) for which [Plaintiff] has been sober/clean" was "three months," however the "relevant findings comment section" notes that Plaintiff "stated [that] the last time she drank was on 12/4/2010" and indicates that Plaintiff was to be "referred by case manager to SASC on 12/16/2010." (R. 443–44.) With respect to the "unstable or untreated medical conditions requiring a wellness plan," Plaintiff's "diagnosis affecting employment" is listed as "major depressive disorder, single episode, severe without psychotic features," and the "recommended treatment/action plan" is "outpatient psychiatric treatment with antidepressant Rx" for a "wellness period" of ninety days. (R. 445.) Plaintiff's current medications were identified as Cymbalta and Seroquel. (R. 449.) Plaintiff's migraine headaches had been "stabilized" and Plaintiff was receiving treatment from her primary care physician. (R. 445, 448.)

Plaintiff's "employment disposition" was listed as "temporarily unemployable," and the "comments supporting [Plaintiff's] employment disposition" state "90 day wellness for major depressive disorder, single episode, severe, without psychotic features." (R. 448–49.) Plaintiff was identified as having a "cognitive/interpersonal/motor" limitation, which is described as "emotional or anger problems." (R. 448.) The recommended accommodation was a "modified work environment," and, specifically, a "low stress environment." (R. 448.)

### 6. February 3, 2011 report by Dr. Malgorzata Witek

On February 3, 2011, Dr. Malgorzata Witek, a psychiatrist at Outreach Project who was treating Plaintiff for alcohol dependence, completed a form in connection with Plaintiff's "wellness plan" at the request of the New York City Human Resources Administration. (*See* R. 467–68.) Dr. Witek reported the following diagnoses for Plaintiff: alcohol abuse,

alcohol induced mood disorder, postpartum depression and histrionic personality.  (R. 467; *see also* R. 228.)  Dr. Witek also reported the following "relevant clinical findings" regarding Plaintiff: "well groomed, cooperative, mood anxious, affect labile, speech excessive, periods of tearfulness, no AVH,[7] no S/H ideations,[8] cognitively grossly intact."  (R. 467.)

As to Plaintiff's prognosis, Dr. Witek reported that it was "too early to say" because Plaintiff had "started the program" one month prior, had seen her psychiatrist only twice and had not started taking prescribed medications because her Medicaid insurance coverage had expired. (R. 467.)  Dr. Witek indicated that Plaintiff's condition had not been resolved or stabilized. (R. 468.)  Dr. Witek also reported that she was unable to determine Plaintiff's "functional capacity" at that time because more information was needed.  (R. 468.)

### 7.  Dr. Hussain's February and April of 2011 opinions

On February 23, 2011, Dr. Fazil Hussain, Arbor WeCare "Lead Physician," opined as to Plaintiff's ability to work.  (*See* R. 451 (stating "Re-Exam Wellness Summary" prepared starting on December 13, 2010), 462 (stating "Completed 2011-02-23 . . . By Fazil Hussain, Lead Physician, Arbor").)  Dr. Hussain indicated that he had reviewed the "[p]sychiatrist wellness plan report dated 2/03/2011."[9]  (R. 462.)  With respect to Plaintiff's "wellness plan," Dr. Hussain reported that the following diagnoses were affecting Plaintiff's employment, postpartum depression and alcohol induced mood disorder.  (R. 462.)  Dr. Hussain determined that a sixty-day extension of Plaintiff's "wellness period" was necessary to allow "for further psychiatric stabilization of depression and mood disorder and for psychiatrist follow up

---

[7]  The Court understands "AVH" to mean "auditory or visual hallucinations."

[8]  The Court understands "S/H ideations" to mean "suicidal/homicidal ideations."

[9]  The Court understands the February 3, 2011 "psychiatrist wellness plan report" referenced in Dr. Hussain's notes to be Dr. Witek's February 3, 2011 report.

re-evaluation report." (R. 462.)

On April 22, 2011, Dr. Hussain opined as to Plaintiff's ability to return to work. (*See* R. 422 (stating "Re-Exam Wellness Summary" prepared starting on February 23, 2011), 433 (stating "Completed 2011-04-22 . . . By Fazil Hussain, Lead Physician, Arbor").) Plaintiff's "employment disposition" was listed as "unable to work," and Dr. Hussain noted that he had reviewed a "[p]sychiatrist wellness plan report dated 4/07/2011" which "indicated that [Plaintiff] is unlikely to be able to work within the next 12 months due to the need for further management of [postpartum] depression, r/o major depressive disorder and r/o adjustment disorder with depressed mood." (R. 432.)

### 8. April 22, 2011 notification of temporary assistance work requirements determination

On April 22, 2011, Plaintiff received a "notification of temporary assistance work requirements determination" from the New York City Human Resources Administration. (*See* R. 470–79.) The notification states that Plaintiff had been "determined to be exempt from participating in temporary assistance work activities effective 4/25/11 because according to medical evidence [she] [was] unable to work due to a medical issue." (R. 470.)

### ii. Outreach Project

Plaintiff received treatment for alcohol dependence at Outreach Project from approximately January of 2011 through September of 2011. (R. 305–16.)

### 1. Initial psychiatric evaluation on January 4, 2011

On January 4, 2011, Plaintiff underwent an initial psychiatric evaluation by psychiatrist Dr. Malgorzata Witek. (R. 315–16.) In assessing Plaintiff's "presenting problem," Dr. Witek noted that Plaintiff had a "long [history] of [alcohol] abuse since age 14. Quickly be[gan] binge drinking mostly on weekends; [history] of blackouts, heavy drinking. One year

ago — [increased] drinking.  When pregnant she stopped drinking.  She relapsed . . . 8.5 months after giving birth."  (R. 315.)  Dr. Witek also evaluated Plaintiff's mental status and rated Plaintiff's appearance as "well-groomed," her attitude as "cooperative," her motor activity as "hyperactive," her affect as "expansive," her mood as "anxious," her speech as "excessive," and her thought process as "intact."  (R. 315.)  With respect to Plaintiff's "thought content," Dr. Witek noted that Plaintiff was not experiencing hallucinations, delusions or suicidal or homicidal ideation.  (R. 315.)  Dr. Witek also rated Plaintiff's self-perception as "alert," her orientation as "fully-oriented," and her memory as "intact."  (R. 315.)  As to Plaintiff's "cognitive function," Dr. Witek indicated that Plaintiff's general knowledge was not intact and that her judgment and insight were moderately impaired while her impulse control was severely impaired.  (R. 315.)  As to Plaintiff's "responses," Dr. Witek checked a box indicating "manipulation."  (R. 315.)

Plaintiff's diagnoses included alcohol abuse, alcohol induced mood disorder, "postpartum depression, r/o atypical depression," and histrionic personality traits.  (R. 316.)  Plaintiff's GAF score was assessed at 45.  (R. 316.)  Dr. Witek recommended that Plaintiff continue her present level of care and start the medications Celexa and Seroquel.  (R. 316.)

## 2.    February to September of 2011 psychiatric records

Plaintiff saw Dr. Witek ten times during the period between February and September of 2011.  (R. 305–14.)  During an appointment with Dr. Witek on February 3, 2011, Plaintiff stated that she felt "frustrated" and "emotionally unstable" because her Medicaid coverage was inactive and she was consequently unable to obtain her medications.  (R. 314.)  Plaintiff complained of poor sleep, irritability, periods of tearfulness, and feeling overwhelmed.  (R. 314.)  Dr. Witek recommended that Plaintiff begin taking Celexa and Seroquel as soon as her Medicaid was activated.  (R. 314.)

On March 15, 2011, Plaintiff reported that she was taking her medications without side effects and was "doing better in terms of calming her racing thoughts" and difficulty sleeping, although she still had periods of low mood and anhedonia. (R. 313.) Plaintiff denied having feelings of hopelessness or suicidal or homicidal ideation. (R. 313.) Dr. Witek recommended that Plaintiff increase her dosage of Seroquel and that Plaintiff begin taking Seroquel XR. (*See* R. 313–14.)

On April 7, 2011, Plaintiff reported increased tiredness due to the increased dosage of Seroquel. (R. 312.) Plaintiff's mood was "okay" when things around her were "okay," but she became anhedonic and depressed in response to "bad or sad news." (R. 312.) Dr. Witek noted some improvement to Plaintiff's mood and daily functioning and recommended that Plaintiff's dosage of Seroquel be decreased and that her dosage of Celexa be increased. (R. 312.)

On April 27, 2011, Dr. Witek reported that Plaintiff was feeling "more dysphoric." (R. 311.) Plaintiff felt that her Celexa medication was "not doing a thing" and reported having engaged in self-injurious behavior. (R. 311.) Dr. Witek recommended that Plaintiff's dosage of Seroquel be increased and that her dosage of Celexa be decreased. (R. 311.) Dr. Witek further recommended that Plaintiff begin taking Effexor XR. (R. 311.)

On May 17, 2011, Plaintiff complained of experiencing "intensive cravings for alcohol, which bother[ed] her and made her anxious and tense." (R. 310.) Plaintiff's mood was "a little bit brighter" and she was less tearful and more optimistic. (R. 310.) Plaintiff had stopped taking Celexa without experiencing any adverse effects, and Dr. Witek recommended that Plaintiff begin taking increased dosages of Seroquel and Effexor, and that she begin taking Campral. (R. 310.)

On June 14, 2011, Plaintiff complained that "nothing works" and Dr. Witek reported that

Plaintiff was more frustrated and upset.  (R. 309.)  Plaintiff indicated that none of the antidepressants she was taking were working and that she felt tired, overwhelmed and hopeless. (R. 309.)  Plaintiff was nonetheless able to maintain her sobriety and care for her son.  (R. 309.) Dr. Witek recommended further changes to Plaintiff's medications.  (R. 309.)

On June 28, 2011, Plaintiff complained of increased alcohol cravings.  (R. 308.) Although Plaintiff was still maintaining her sobriety, she reported that doing so was "more difficult."  (R. 308.)  Her mood was "a bit brighter" and she appeared "a little bit more relaxed and less frustrated."  (R. 308.)  Dr. Witek again recommended changes to Plaintiff's medications. (R. 308.)

On July 19, 2011, Plaintiff reported "feeling better: less depressed, more energetic, and more optimistic about her future [and] . . . 'like the cloud [had] finally lifted over [her] head.'" (R. 307.)  Dr. Witek recommended additional changes to Plaintiff's medications.  (R. 307.)

On August 4, 2011, Plaintiff complained of "periods of taking stress [out] on herself and pulling her hair in a[n] obsessive way."  (R. 306.)  Dr. Witek reported that Plaintiff was sleeping better, eating more regularly, and "doing better" "overall" but that she "still ha[d] problems coping with stress."  (R. 306.)  Dr. Witek recommended consideration of an outpatient mental health treatment clinic.  (R. 306.)

On September 23, 2011, Plaintiff reported feeling "tense [and] angry if things [were] not going her way."  (R. 305.)  Dr. Witek noted that Plaintiff was about to complete the program at Outreach Project and would begin treatment at Bleuler Psychotherapy Center.  (R. 305.)

### 3.    September 23, 2011 letter from Dr. Witek

On September 23, 2011, Dr. Witek wrote a letter to Bleuler Psychotherapy Center stating that Plaintiff was completing her program at Outreach Project and needed continued

psychotherapy and medication management.  (R. 505.)  The letter also states that, while

Plaintiff's current medications were "provid[ing] some symptoms relief" and Plaintiff's

"emotions ha[d] been more under control," Plaintiff had tried "several" antidepressants that had

"no effect."  (R. 505.)

### 4.  Undated, unsigned and incomplete medical questionnaire

On September 19, 2011, the New York State Office of Temporary and Disability

Assistance ("OTDA") sent a medical questionnaire to Outreach Project and asked that Outreach

Project submit either the completed questionnaire or the records related to Plaintiff's treatment.

(*See* R. 294–302.)  Outreach Project appears to have faxed a partially-completed, unsigned and

undated medical questionnaire to the OTDA on October 3, 2011.  (*See* R. 294 (fax cover sheet),

296–302 (partially-completed medical questionnaire).)  The responses to the questionnaire

indicate that Plaintiff initially presented with diagnoses of alcohol abuse, alcohol induced mood

disorder, postpartum depression, rule out atypical depression, and histrionic personality traits.

(R. 298.)  Plaintiff's GAF score was 45.  (R. 298.)  She initially attended treatment four times a

week, but the frequency of her appointments was subsequently reduced to twice a week.

(R. 298.)  She was "seen by the primary counselor about once a week" and by a psychiatrist on a

monthly basis.  (R. 298.)

According to the questionnaire, Plaintiff was admitted on December 22, 2010, and

discharged on September 28, 2011, at which time she had "successfully completed all goals."

(R. 298.)  Mental status examination findings showed that Plaintiff's attitude, appearance and

behavior were "positive," and her speech, thought, and perception were "intact."  (R. 299.)  Her

mood and affect were "tense and angry if things [were] not going the way she want[ed]."

(R. 299.)  Her attention and concentration were rated as "good, cooperative," and her memory,

insight and judgment were intact.  (R. 299.)  Plaintiff's "activities of daily living" included caring for her son, attending scheduled appointments, shopping and cooking.  (R. 300.)  She could use public transportation and she spent time being "active at the park."  (R. 300.)  Plaintiff did not have any suicidal features.  (R. 300.)  As to her "ability to do work related mental activities," the response to the questionnaire indicates that Plaintiff was "capable of performing job responsibilities."  (R. 300.)  There was "no limitation" to Plaintiff's understanding and memory, sustained concentration and persistence, social interaction, and adaption.  (R. 301.)

### iii.   Bleuler Psychotherapy Center

Plaintiff began receiving treatment at Bleuler Psychotherapy Center ("Bleuler") in or around early September of 2011, (R. 533–34), and she was still receiving treatment at Bleuler at the time of the hearing, (R. 35–36).

### 1.   September 14, 2011 intake report

On September 14, 2011, Rachel Ambers, LMSW, assessed Plaintiff and prepared an "intake report."  (*See* R. 508–26.)  Plaintiff reported that she had "night rages," which caused her to become "very 'moody' and 'angry' at night."  (R. 509.)  She also reported feeling depressed and stated that her "son [was] her anti-depressant."  (R. 509.)  Plaintiff noted that she cried a lot, but did not have any issues with sleep or her appetite.  (R. 509.)  Plaintiff reported pulling her hair out.  (R. 509.)  Plaintiff also reported that her father was an alcoholic and was physically abusive to both Plaintiff and her sister.  (R. 510.)  Plaintiff stated that her goal was to get a commercial driver's license and drive an Access-A-Ride bus.  (R. 511.)  She did not report any medical conditions other than acne.  (R. 512.)  Plaintiff's diagnoses included mood disorder, not otherwise specified; alcohol dependence with physiological dependence, early partial remission; and trichotillomania.  (R. 513.)  A GAF score of 50 was assessed.  (R. 513.)  Ms. Ambers noted

that Plaintiff appeared to have "self-medicated with alcohol for many years due to the pain caused by . . . physical abuse and emotional neglect." (R. 513.) Ms. Ambers also noted that Plaintiff appeared to be "having difficulty dealing with her feelings now that she [was] no longer abusing alcohol and [had] begun pulling out her hair as way of 'coping.'" (R. 513.)

Upon conducting a mental status examination, Ms. Ambers noted that Plaintiff's general behavior was appropriate and her speech was fluent and articulate. (R. 515.) Plaintiff had no disturbances of thought or perception and her mood and affect were "appropriate to content." (R. 515.) She was alert and oriented with "fair" insight and judgment, "impaired" impulse control, "average" intelligence, and "adequate" I.Q. and memory. (R. 515.) Plaintiff's "self-care and activities of daily living" were "adequate." (R. 515.) Upon conducting a suicide risk assessment, Ms. Ambers noted that Plaintiff had thoughts of hurting herself and suicidal ideation but had not attempted suicide or made suicide gestures in the past. (R. 516.) Ms. Ambers also conducted a substance abuse risk assessment and noted Plaintiff's past alcohol abuse and that she was receiving treatment at Outreach Project and wished to attend a women's AA group. (R. 522–24.)

### 2. November 21, 2011 psychiatric consultation with Dr. Ilyse Rosenberg

On November 21, 2011, psychiatrist Dr. Ilyse Rosenberg saw Plaintiff for a psychiatric consultation. (R. 527–32.) Plaintiff complained of increasing anxiety and depression, and reported pulling her hair out and cutting her fingernails. (R. 527.) She also reported a history of flashbacks to physical abuse during her childhood that led to rage. (R. 527.) She denied any previous hospitalization and denied suicidal or homicidal ideation. (R. 527–29.) Dr. Rosenberg found Plaintiff to be well-groomed and cooperative with a well-related attitude and normal speech. (R. 530.) Her mood and affect were of full range, her thoughts were linear, and she

denied delusions or hallucinations.  (R. 530.)  Plaintiff's insight and judgment were fair and her

cognitive function was intact.  (R. 531.)  Dr. Rosenberg diagnosed Plaintiff as having a history of

intermittent explosive disorder; major depression disorder, recurrent; PTSD; and a history of

alcohol dependence in early sustained remission.  (R. 531.)  Plaintiff's GAF score was assessed

at 55.[10]  (R. 531.)  Dr. Rosenberg recommended continued individual therapy and AA group

meetings and prescribed Pristiq, Seroquel for "mood stability," and Abilify for "refractory

depression."  (R. 532.)

### 3. October 2011 to September 2012 therapy with Dr. Vanessa Caskey

Plaintiff saw psychologist Dr. Vanessa Caskey for individual therapy at Bleuler from

October of 2011 until at least September of 2012.  (R. 533–50.)  Dr. Caskey's treatment notes

regarding her appointments with Plaintiff indicate that on October 14, 2011, Plaintiff presented

with a depressed mood and Dr. Caskey and Plaintiff discussed Plaintiff's "history [with]

cutting."  (R. 550.)

On November 1, 2011, Plaintiff presented with a depressed mood.  (R. 549.)  On

November 15, 2011, Plaintiff presented "extremely depressed" and reported hopelessness.

(R. 549.)  On November 29, 2011, Plaintiff was less depressed but was very angry at herself for

her self-injurious behavior.  (R. 548.)

On December 6, 2011, Plaintiff was in an angry mood because she had forgotten the

notes she took regarding her "self-harm (trichotillomania and cutting nails)."  (R. 548.)  Dr.

Caskey and Plaintiff discussed how easily Plaintiff was able to become frustrated.  (R. 548.)

---

[10]  "A GAF in the range of 51 to 60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'"  *Zabala*, 595 F.3d at 406 n.3 (quoting *Diagnostic and Statistical Manual of Mental Disorders*, at 34)).

On December 13, 2011, Plaintiff's mood was frustrated but she presented as less depressed. (R. 548.) Dr. Caskey and Plaintiff "continued to explore" Plaintiff's self-injurious behavior as well as coping strategies. (R. 548.) On December 20, 2011, Plaintiff's mood was euthymic. (R. 547.)

On January 16, 2012, Plaintiff presented with a depressed mood, but reported feeling better overall and having recovered some "optimism." (R. 547.) Coping strategies, Plaintiff's mother, and Plaintiff's self-injurious behavior were discussed. (R. 547.) On January 24, 2012, Plaintiff's mood was euthymic and she reported that coping strategies such as exercise and journal writing had "helped a lot." (R. 547.) She also reported "decreased cutting and no hair pulling." (R. 547.) On January 31, 2012, Plaintiff was depressed. (R. 546.)

On February 21 and 28, 2012, Plaintiff's mood was euthymic and she reported that the coping strategies were working and she was finally beginning to feel less depressed. (R. 546.) On March 13, 2012, Plaintiff's mood was euthymic and she looked "livelier" overall. (R. 545.) Dr. Caskey and Plaintiff discussed Plaintiff's experience with a soap that reminded her of her father and triggered a "rage reaction" and led Plaintiff to break four plates. (R. 545.) On March 20, 2012, Plaintiff was angry and reported feeling disgusted by the way men looked at her on the subway. (R. 545.)

On April 3, 2012, Plaintiff's mood was euthymic. (R. 544.) On April 13, 2012, Plaintiff presented as frustrated and reported that her son had fallen and that she had responded to this by cutting her nails. (R. 544.) On April 24, 2012, Plaintiff was in a frustrated mood and reported complaints about recent changes to her medication. (R. 544.) On May 8, 2012, Plaintiff was distressed about a one-day alcohol relapse. (R. 542.) On June 5, 2012, her mood was euthymic. (R. 543.) On June 21, 2012, Plaintiff's mood was angry. (R. 542.) On June 26, 2012, she was

euthymic.  (R. 541.)

On July 10, 2012, Plaintiff presented crying and depressed and reported frequent suicidal ideation, but denied that she had any intent to commit suicide.  (R. 541.)  Dr. Caskey and Plaintiff discussed the possibility of increasing her Wellbutrin dose and Dr. Caskey indicated that she would write a note to Dr. Rosenberg, Plaintiff's psychiatrist at Bleuler.  (R. 541.)  On July 17, 2012, Plaintiff was angry and depressed.  (R. 540.)  On July 24, 2012, she was feeling less depressed and reported rewarding experiences with her son.  (R. 539.)

On August 2, 2012, Plaintiff's mood was euthymic and she reported efforts to find work. (R. 538.)  Plaintiff also reported a reduction in her self-injurious behavior.  (R. 538.)  On August 7, 2012, Plaintiff was depressed "over an attempt at a waitressing job," but Dr. Caskey noted that Plaintiff showed great judgment and coping skills in handling a difficult situation.  (R. 538.)

On August 14, 2012, Dr. Caskey wrote a letter to Dr. Rosenberg stating that, although Plaintiff had been "doing a bit better," Plaintiff had "begun to decompensate" after starting to process her life history and trauma.  (R. 506.)  Dr. Caskey indicated that although she was trying to keep Plaintiff from "flooding," Plaintiff was having between three and five flashbacks per week, each of which was triggered by small memories.  (R. 506.)  Dr. Caskey reported that, as a result of her flashbacks, Plaintiff's self-injurious behavior had worsened.  (R. 506.)  Dr. Caskey stated that she "want[ed] to make sure that [Drs. Caskey and Rosenberg] [could] decrease flashbacks and stabilize [Plaintiff] a bit more."  (R. 506.)  Dr. Caskey also noted that it was "becoming clear that the physical abuse and maternal neglect [suffered by Plaintiff] were more severe than [they] seemed at first."  (R. 506.)

On August 15, 2012, Dr. Caskey noted that Plaintiff presented as very depressed. Plaintiff reported that she experienced a flashback to childhood abuse while bathing her son and

indicated that she felt a stinging sensation on her back as part of the flashback.  (R. 537.)  On August 22, 2012, Plaintiff presented as frustrated.  (R. 537.)  On August 27, 2012, Plaintiff was anxious and again reported a flashback.  (R. 536.)

On September 7, 2012, Plaintiff was anxious, but reported several positive experiences and indicated that her flashbacks had decreased.  (R. 535.)  On September 11, 2012, she was anxious about her disability application.  (R. 535.)

### 4. September 10, 2012 report by Drs. Caskey and Rosenberg

On September 10, 2012, Drs. Caskey and Rosenberg completed a "physician's report for claim of disability due to mental impairment" form.  (R. 554–60.)  Their responses indicate that Plaintiff attended weekly psychotherapy sessions and monthly psychiatric consultations at Bleuler.  (R. 554.)  The doctors reported that Plaintiff continued to engage in multiple self-injurious behaviors in an attempt to control her overwhelming emotions.  (R. 554.)  Every day, with some more extreme episodes, she cut her nails to induce bleeding and compulsively pulled her hair out, leading to bald spots and boils.  (R. 554.)  In addition to the self-injurious behavior, Plaintiff presented with symptoms of PTSD including flashbacks which, at times, included tactile hallucinations; hypervigilance; difficulty concentrating; irritability and outbursts of anger.  (R. 556.)  Plaintiff also presented with anhedonia, exacerbated fears, and profound difficulty managing anger.  (R. 556.)  Her diagnoses were major depressive disorder, moderate, recurrent; and PTSD, chronic delayed onset.  (R. 556.)  Plaintiff's GAF was assessed at 55.  (R. 556.)

Drs. Caskey and Rosenberg indicated that Plaintiff had a history of trauma due to the physical abuse she suffered at the hands of her father and the humiliation she experienced as an exotic dancer.  (R. 555.)  The doctors explained that, over time, Plaintiff developed PTSD symptoms including flashbacks and intense psychological distress in response to external cues

resembling an aspect of the trauma she endured. (R. 555.) As a result, Plaintiff was hypervigilant when outside of her home and she struggled psychologically with most encounters with males. The doctors further explained that Plaintiff's PTSD likely had a delayed onset because, for many years, Plaintiff had been self-medicating with alcohol. (R. 555.) Plaintiff did not have the psychological resources to search for or maintain a job because she was experiencing significant distress on a daily basis. (R. 555.) Although Plaintiff was highly motivated and her attendance at therapy appointments was excellent, Plaintiff was still in the process of developing adaptive coping strategies and her current state was "too fragile." (R. 555, 557.)

The doctors also noted that Plaintiff was taking Wellbutrin, Seroquel and Celexa. (R. 557.) While Plaintiff needed Seroquel to manage her "frequent bouts of agitation and overwhelming emotional states," the drug was sedating and, once it took effect, Plaintiff was "too sedated to perform significant work duties." (R. 557.) Plaintiff's activities of daily living were limited to a moderate degree because she feared leaving her house and became highly anxious when outside due to her fear of environmental triggers such as "catcalls on the street." (R. 558.) Plaintiff's ability to maintain social functioning was limited to a marked degree due to the tremendous anxiety she experienced when interacting with male figures, her difficulty with trust, inability to create a support system and social isolation. (R. 558.)

Plaintiff had a slight-to-moderate limitation in the area of her "concentration, persistence of pace resulting in failure to complete tasks in a timely manner (in work settings o[r] elsewhere)." (R. 559.) Plaintiff had a marked limitation due to "episodes of deterioration of decompensation on work or work-like settings which cause the patient to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration

of adaptive behaviors)." (R. 559.) Drs. Caskey and Rosenberg noted a specific incident in which Plaintiff had been unable to perform at a waitressing job due to a flashback which caused ringing in her ears, heart racing, and hyperventilation, and which was triggered by a male customer who called Plaintiff "momma." (R. 559.) Although Plaintiff was able to travel alone on a daily basis by bus and subway, she was "easily triggered" on the subway by inappropriate attention from men. (R. 560.)

### 5. September 12, 2012 assessment by Dr. Caskey

On September 12, 2012, Dr. Caskey completed a "mental residual functional capacity assessment" for Plaintiff. (R. 551–53.) Dr. Caskey rated the extent of any limitations to various aspects of Plaintiff's (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction and (4) adaptation. First, with respect to Plaintiff's understanding and memory, there was no evidence of limitations to her ability to remember locations and work-like procedures or her ability to understand and remember very short and simple instructions. (R. 551.) Her ability to understand and remember detailed instructions was not significantly limited. (R. 551.)

Second, with respect to Plaintiff's sustained concentration and persistence, there was no evidence of limitations to her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; or to her ability to sustain an ordinary routine without special supervision. (R. 551.) Plaintiff was markedly limited in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (R. 552.) She was moderately limited in her abilities to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without

being distracted by them, and to make simple work-related decisions. (R. 551.) She was not significantly limited in her abilities to carry out very short and simple instructions or to carry out detailed instructions. (R. 551.)

Third, with respect to Plaintiff's social interaction, she was markedly limited in her ability to interact appropriately with the general public and in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (R. 552.) She was not significantly limited in her abilities to ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors, and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. 552.)

Finally, with respect to Plaintiff's adaptation, there was no evidence of any limitation to her ability to be aware of normal hazards and take appropriate precautions. (R. 552.) She was markedly limited in her ability to respond appropriately to changes in the work setting and in her ability to travel to unfamiliar places or use public transportation. (R. 552.) She was not significantly limited in her ability to set realistic goals or make plans independently of others. (R. 552.)

In elaborating on the foregoing conclusions, Dr. Caskey wrote that Plaintiff's response to her history of trauma had been behaviorally and internally maladaptive. (R. 553.) Plaintiff was unable to manage her extreme emotions and engaged in self-injurious behavior to contain her emotions. (R. 553.) Plaintiff's PTSD symptoms impaired her capacity to function well enough to maintain a steady job. (R. 553.) Plaintiff had "not yet developed a suitable toolkit of emotional coping strategies," and this left her "without resources to cope with emotional stressors and barely able to manage her daily chores." (R. 553.) Before Plaintiff could reenter the workforce full time, her mental health needed to be further stabilized and she needed to

develop better coping skills and learn how to manage her PTSD and depression. (R. 553.)

### iv. Consultative examiner and state agency consultants

#### 1. Dr. Ilene Friedman

On July 21, 2011, internist Dr. Ilene Friedman consultatively examined Plaintiff. (R. 289–91.) Plaintiff reported that she cooked three times per week and cleaned, did laundry, and shopped once per week. (R. 289.) Plaintiff showered, bathed, and dressed herself on a daily basis. (R. 289.) She also watched television, listened to the radio, read and went to the market. (R. 289.) Dr. Friedman examined Plaintiff and determined that she was in no acute distress, and that she had a normal gait and stance. (R. 290.) Dr. Friedman opined that Plaintiff had no physical limitations. (R. 291.)

#### 2. Dr. Jennifer Kyle

On July 21, 2011, psychologist Dr. Jennifer Kyle consultatively evaluated Plaintiff and completed a psychiatric evaluation. (R. 284–88.) Dr. Kyle noted that Plaintiff traveled independently to the examination by train with her eleven-month old son. (R. 284.) Plaintiff graduated from high school having taken regular education classes. (R. 284.) Plaintiff reported that her sleep was normal and she had experienced a decrease in appetite. (R. 284.) In the past four weeks, she had experienced significant dysphoric moods accompanied by crying spells, irritability and feelings of worthlessness. (R. 284.) She reported a history of cutting herself and pulling her hair, but denied suicidal ideation, plan, or intent. (R. 284.) She reported excessive apprehension and worry but denied any manic or panic like symptomology. (R. 284–85.) Plaintiff also reported some difficulty concentrating. (R. 285.) Plaintiff reported that she was able to bathe, dress, and groom herself; cook and prepare meals; do general cleaning and laundry; and shop. (R. 286.) She was able to take public transportation and did not rely on

others for assistance.  (R. 286.)

Upon conducting a mental status examination, Dr. Kyle reported that Plaintiff was cooperative with an adequate manner of relating.  (R. 285.)  She was casually dressed and disheveled but well groomed, although she wore a wig because she had pulled out her hair. (R. 285.)  Her speech was fluent and clear with adequate expressive and receptive language. (R. 285.)  Plaintiff's thought processes were coherent and goal directed.  (R. 285.)  Her affect was restricted, anxious, and tense, and her mood was dysphoric.  (R. 286.)  Her sensorium was clear and she was fully oriented.  (R. 286.)  Her attention, concentration and memory were mildly impaired due to anxiety and nervousness.  (R. 286.)  Her cognitive functioning was below average and somewhat limited and her insight and judgment were fair.  (R. 286.)  Dr. Kyle diagnosed major depressive disorder, moderate, without psychotic features, and alcohol abuse in partial early remission.  (R. 287.)

In a medical source statement, Dr. Kyle opined that Plaintiff could follow and understand simple instructions and directions.  (R. 287.)  She was moderately impaired in her abilities to perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and deal appropriately with stress.  (R. 287.)  Dr. Kyle opined that these impairments were due to Plaintiff's "lack of motivation and her distractibility over her anxiety."  (R. 287.)  Continued mental health treatment was recommended and Plaintiff's prognosis was fair given the extent of her depressive and anxiety related symptoms.  (R. 287.)

### 3.  Dr. P. Kudler

On October 6, 2011, State agency psychiatric consultant Dr. P. Kudler reviewed the record and completed a "psychiatric review technique" form, assessing Plaintiff's mental

impairments under the "B" criteria of the Listings of Impairments set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 480–93.) Dr. Kudler considered Listings 12.02 (Organic Mental Disorders), 12.08 (Personality Disorders), and 12.09 (Substance Addiction Disorders). (R. 480.) Dr. Kudler concluded that Plaintiff was mildly impaired in her activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence or pace. (R. 490.) Dr. Kudler further concluded that Plaintiff had one or two episodes of deterioration, each of extended duration. (R. 490.)

Dr. Kudler also completed a "mental residual functional capacity" form on October 6, 2011. (R. 494–97.) Dr. Kudler concluded that Plaintiff was not significantly limited in her understanding and memory, sustained concentration and persistence, social interaction and adaptation. (R. 494–95.) Dr. Kudler reported that Plaintiff "carries a diagnosis of Alcohol Abuse, Mood Disorder secondary to Alcohol Abuse and Histrionic Personality Disorder." (R. 496.) Dr. Kudler also noted two of the medical records — the psychiatric evaluation completed by Dr. Kyle and "a report from the tmd."[11] (R. 496.) Dr. Kudler noted that "the tmd reports that there are no significant deficits in [Plaintiff's] ability to concentrate, relate to others, adapt to new situations or any deficits in her memory skills." (R. 496.) Giving "greater weight" to the "findings of the tmd," Dr. Kudler concluded that Plaintiff "exhibit[ed] adequate social, cognitive and coping skills." (R. 496.)

### v.   Testimony of medical expert Dr. Chufameka Efobi

Psychiatrist and medical expert Dr. Chufameka Efobi testified at the November 26, 2012 hearing at the request of the Social Security Administration. (R. 49–76.) Based upon his

---

[11]   The "report from the tmd" appears to be the undated, unsigned and partially-completed medical questionnaire filled out by someone affiliated with Outreach Project at the request of the New York State Office of Temporary and Disability Assistance. (R. 496.)

review of the record as well as Plaintiff's testimony during the hearing, Dr. Efobi formed an opinion as to the nature and severity of Plaintiff's impairments during the relevant period. (R. 50.)  Dr. Efobi testified that Plaintiff's impairments included depressive disorder, anxiety disorder, borderline personality disorder, and alcohol dependence in possible partial remission. (R. 50–51.)  He further testified that Plaintiff's depression was "mild to moderate" and, with respect to Plaintiff's anxiety disorder, he noted that Plaintiff had "symptoms of PTSD [with] a questionable severity."  (R. 51.)  Dr. Efobi's ultimate conclusion was that Plaintiff's impairments did not meet or medically equal the criteria for any of the impairments set forth at 20 C.F.R. § Pt. 404, Subpt. P, App. 1.  (*See* R. 52–55.)

Dr. Efobi began by explaining that he had organized the medical evidence chronologically.  (R. 51.)  With respect to the records from Outreach Project, Dr. Efobi noted that the records "started describing [Plaintiff's] illness [in] January of 2011 [and] clearly showed the struggle she was having with her sobriety."  (R. 51.)  Dr. Efobi also noted Dr. Witek's session notes from May 17, 2011 indicating that Plaintiff had been experiencing intense cravings for alcohol which, in turn, made her more anxious, depressed and hopeless.  (R. 51 (citing R. 310).)  Dr. Efobi also noted that the Outreach Project records indicate Plaintiff was experiencing increased tiredness due to the change to the dosage of her Seroquel prescription. (R. 51.)

Dr. Efobi noted that the psychiatric evaluation prepared by Dr. Kyle, the consultative examiner, showed that on July 21, 2011, Plaintiff reported loss of appetite, feeling worthless, having crying spells, feeling irritable, and cutting herself and pulling out her hair.  (R. 52.)  Dr. Efobi noted that Plaintiff denied having panic or manic symptomology and reported that her sleep was okay but she did have dysphoric moods.  (R. 52.)

Dr. Efobi also noted that, "moving forward," based on the Bleuler records from September of 2011 to September of 2012, Plaintiff's mood "seemed to improve and the issue that she was having that was more prominent was the flashbacks." (R. 52.) Dr. Efobi stated that the Bleuler records demonstrate that:

> from September of 2011 all the way to 2012[,] [Plaintiff's] mood was mostly euthymic. That the mood was okay up until August of 2012 when [Dr. Caskey] started . . . taking [Plaintiff] through . . . trying to process . . . the traumas she experienced in the past and that was when the flashbacks started occurring . . . three to four times per week . . . so it looks like the anxiety picked up [in] September of 2012 [as] the severity increased at that point [while] the mood was physically okay.

(R. 52 (citing R. 506).) With respect to the increase in the frequency with which Plaintiff experienced flashbacks, Dr. Efobi testified that it "is expected" that "somebody [who] is in long term therapy [will] have periods of trauma in regards to trying to process the past." (R. 52.) Dr. Efobi also noted that the records did not evidence "reports of the self-mutilation that [Plaintiff] described happening every day [when she testified during the hearing]." (R. 52.) Dr. Efobi noted that he "didn't see that in the process notes," and instead he saw "just mostly the flashbacks." (R. 52.)

Dr. Efobi then considered the following listings set forth at 20 C.F.R. § Pt. 404, Subpt. P, App. 1: Listings 12.04 pertaining to Affective Disorders, 12.06 pertaining to Anxiety Related Disorders, 12.08 pertaining to Personality Disorders, and 12.09 pertaining to Substance Addiction Disorders. (*See* R. 53–55.) In order to meet the requirements of any of the listings considered by Dr. Efobi, Plaintiff was required to satisfy both the "paragraph A" criteria and the "paragraph B" criteria for each listing.[12] *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1. While the

_____

[12] As distinct from Listings 12.04, 12.06 and 12.08, Listing 12.09, pertaining to Substance Addiction Disorders, provides that the required level of severity for that listing is

"paragraph A" criteria "substantiate[s] medically the presence of a particular mental disorder"

and is different for each listing, the "paragraph B" criteria addresses "impairment-related

functional limitations that are incompatible with the ability to do any gainful activity" and is the

same for each of the listings considered by Dr. Efobi. In order to satisfy the paragraph B criteria,

Plaintiff was required to show that each of her impairments:

> B. Result[ed] in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

Dr. Efobi first considered Listing 12.04 (Affective Disorders) as to "depressive disorder

NOS, to rule out manic depressive disorder, mild to moderate, to rule out adjustment disorder

with depressive disorder with depressed mood[,] to rule out alcohol induced depressive

disorder." (R. 53.) Dr. Efobi testified that, although Plaintiff "does have issues with

depression," her "symptoms were not really bad" and did not "satisfy the paragraph A" criteria

under Listing 12.04.[13] (R. 53.)

Dr. Efobi considered Listing 12.06 (Anxiety Related Disorders) and stated that Plaintiff's

"more prominent disorder would be the anxiety disorder NOS, rule out alcohol induced anxiety

disorder, rule out adjustment disorder with depression and anxiety, also rule out PTSD." (R. 53.)

---

satisfied where the requirements under certain other listings, including listings 12.04, 12.06 and 12.08, are met.

[13] The paragraph A criteria for Listing 12.04 is satisfied where a claimant has "depressive syndrome" characterized by at least four of the symptoms specified under the listing, "manic syndrome" characterized by at least three specified symptoms, or "bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes." 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

Citing to specific portions of the Bleuler records, Dr. Efobi testified that Plaintiff's "PTSD symptoms" did satisfy the paragraph A criteria for Listing 12.06 because Plaintiff experienced "[r]ecurrent and intrusive recollections of a traumatic experience, which [were] a source of marked distress."[14] (R. 53 (citing R. 506 (Aug. 14, 2012 letter from Dr. Caskey to Dr. Rosenberg), 527 (Nov. 21, 2011 psychiatric consultation form completed by Dr. Rosenberg), 536–37 (Dr. Caskey's treatment notes from Aug. 15, 22 and 27, 2012 sessions)).)

Dr. Efobi considered Listing 12.08 (Personality Disorders), which he testified "would be the borderline personality disorder which is quite clear in regards to the reports that [Plaintiff] gave through her testimony." (R. 53.) Dr. Efobi concluded that Plaintiff did satisfy the paragraph A criteria under Listing 12.08 because the record evidenced "[p]ersistent disturbances of mood or affect" and "[i]ntense and unstable interpersonal relationships and impulsive and

---

[14] The paragraph A criteria for Listing 12.06 is as follows:
A. Medically documented findings of at least one of the following:
1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
a. Motor tension; or
b. Autonomic hyperactivity; or
c. Apprehensive expectation; or
d. Vigilance and scanning; or
2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
4. Recurrent obsessions or compulsions which are a source of marked distress; or
5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.
20 C.F.R. § Pt. 404, Subpt. P, App. 1.

damaging behavior."[15]  (R. 53 (citing 20 C.F.R. § Pt. 404, Subpt. P, App. 1).)  As to the evidence

he relied on, in addition to Plaintiff's testimony during the hearing, Dr. Efobi noted the report

prepared by consultative examiner Dr. Kyle which reflects that Plaintiff reported self-injurious

behavior.  (R. 53 (citing R. 284).)  While Plaintiff satisfied the paragraph A criteria, Dr. Efobi

concluded that Plaintiff's personality disorder was not severe because "usually if somebody has a

severe . . . borderline . . . personality disorder they usually would have seen a couple of ER visits

o[r] inpatient hospitalizations," which was not the case with Plaintiff.  (R. 53–54.)

Dr. Efobi considered Listing 12.09 (Substance Addiction Disorders) and noted that the

record demonstrates that Plaintiff's use of alcohol began at age fourteen and was "quite severe"

but that "the severity ended or stopped at about January of 2011."  (R. 54.)  Dr. Efobi also noted

that the Bleuler records evidence a relapse in May of 2012.  (R. 54 (citing R. 543).)

Dr. Efobi then turned to the paragraph B criteria for the Listings and considered "the

possible severity of [Plaintiff's] problems and how [they] affect[ed] [her] functioning."  (R. 54.)

He noted that Plaintiff was "able to take care of herself and her son and . . . taking care of a boy

that young is usually a lot of work."  (R. 54.)  Dr. Efobi also testified that "[a]nybody that is able

to take care of a child that young should be able to work, I think, as a matter of the severity of the

problem."  (R. 58.)

---

[15]  The paragraph A criteria for Listing 12.08 is as follows:
> A. Deeply ingrained, maladaptive patterns of behavior associated
> with one of the following:
> 1. Seclusiveness or autistic thinking; or
> 2. Pathologically inappropriate suspiciousness or hostility; or
> 3. Oddities of thought, perception, speech and behavior; or
> 4. Persistent disturbances of mood or affect; or
> 5. Pathological dependence, passivity, or aggressivity; or
> 6. Intense and unstable interpersonal relationships and impulsive
> and damaging behavior.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

Dr. Efobi also noted that Plaintiff was able to do activities of daily living and "regular chores you have in the house." (R. 54.) Therefore, he concluded that the restriction to Plaintiff's activities of daily living was "mild." (R. 54.) In reaching this conclusion, Dr. Efobi cited the reports prepared by consultative examiners Drs. Kyle, Friedman and Kudler. (R. 54 (citing R. 286, 291, 490).)

With respect to the extent of Plaintiff's "difficulties in maintaining social functioning," Dr. Efobi noted that while Plaintiff "did say that she's more isolated," she left the house to "take care of business" and also cared for her son. (R. 54.) Dr. Efobi also noted that Dr. Kudler's report indicated that there was no significant limitation to Plaintiff's social functioning. (R. 54 (citing R. 490, 495).) Given the foregoing, and in light of Plaintiff's increased flashbacks in or around September of 2012, Dr. Efobi rated Plaintiff's difficulties in maintaining social functioning as "mild to moderate." (R. 54.)

With respect to the extent of Plaintiff's "difficulties in maintaining concentration, persistence, or pace," Dr. Efobi noted that "all the reports with regards to [Plaintiff's] mental status showed [a] mild to moderate level of limitation for concentration." (R. 54–55.) He specifically cited to the reports prepared by consultative examiners Drs. Kyle and Kudler and the undated and unsigned medical questionnaire prepared by Outreach Project. (R. 55 (citing R. 285, 299, 490, 494–95).) Dr. Efobi concluded that Plaintiff's difficulties in maintaining concentration, persistence or pace were "mild to moderate" given "the flashbacks that she complained about that got worse when her therapy started in August." (R. 55.)

As to whether Plaintiff had experienced "repeated episodes of decompensation, each of extended duration," Dr. Efobi stated that "it's usually difficult to make out decompensation if there's no ER visit or hospitalization but the fact that [Plaintiff] was having those

flashbacks . . . since the therapy started I will put it at two to three but that's more difficult to put a time line on." (R. 55.) Based on all of the foregoing, Dr. Efobi concluded that Plaintiff "did not meet or satisfy any of the listings[,] mostly because of the [B] criteria." (R. 55.) Despite concluding, overall, that Plaintiff did not meet or satisfy any of the listings, Dr. Efobi testified that Plaintiff came "close" to satisfying a listing in August of 2012, (R. 70), given the increased flashbacks she experienced at that time, (*see* R. 69–70).

The ALJ also asked Dr. Efobi whether the evidence supported Plaintiff's testimony that she cut herself and pulled her hair out on a daily basis. (R. 55.) Dr. Efobi testified that, while he did not doubt the veracity of Plaintiff's testimony as to the frequency with which she engaged in such behavior, he concluded that the behavior was "not that severe." (R. 55.) He testified that "usually[,] self-mutilating behavior of severity [involves] cutting [the] wrist or [] skin" to an extent that concerns about the patient's "dangerousness to self" are triggered, and the doctors or therapists responsible for such a patient would generally respond to this behavior by "request[ing] a higher level of care." (R. 55–56.) Dr. Efobi testified that, in reviewing the "process notes" regarding Plaintiff's treatment, he "didn't see any concern that jumps out with regard to the therapist or the doctor when it comes to [Plaintiff's self-injurious] behavior." (R. 56.) Dr. Efobi testified that "if the symptoms were as severe as" Plaintiff claimed, "the average treating psychiatrist would . . . refer her to a high level of care, and I don't see that as discussion here." (R. 65.) He also stated that "the fact that [Plaintiff was] still able to care for her child and do her regular daily stuff also point[ed] to the possibility that the severity [was] not as much as, she sa[id] it [was]." (R. 65.) Dr. Efobi testified that the lowest level of care he would expect to see in cases of severe self-mutilating behavior would be an intensive outpatient treatment program, such as a "dialectical behavioral therapy program," and, in more severe

cases, he would expect to see ER visits followed by inpatient treatment for stabilization. (R. 56.)

In terms of Plaintiff's functional limitations due to her impairments, Dr. Efobi testified that Plaintiff would probably be most affected in the areas of social functioning and concentration. (R. 56.) Specifically, Plaintiff's anxiety would likely affect her concentration and her self-mutilating behavior would likely affect her social functioning. (R. 56.)

The ALJ questioned Dr. Efobi regarding specific discrepancies between Dr. Efobi's opinion and that of Dr. Caskey. (*See* R. 70–72.) Specifically, the ALJ noted that while Dr. Caskey concluded that certain of Plaintiff's abilities in the areas of social functioning and concentration were markedly limited, Dr. Efobi rated Plaintiff's difficulties in maintaining social functioning and concentration as "mild to moderate." (*See* R. 71–72.) The ALJ noted that this distinction was significant because while Plaintiff would meet a listing if Dr. Caskey's opinion were credited, the inverse would be true if Dr. Efobi's opinion was accepted. (*See* R. 70–72.)

As to the basis for his opinion that Plaintiff's difficulties in maintaining social functioning were "mild to moderate," Dr. Efobi noted that Plaintiff was able to care for herself and her son on a daily basis which included activities such as going shopping and using public transportation which, in turn, required that Plaintiff be capable of having "basic interactions." (R. 72.)

Dr. Efobi testified that he rated Plaintiff's difficulty maintaining concentration as "moderate" as of August of 2012 only, and that he otherwise rated it "mild," because while "there was mention of flashbacks in the record earlier" than August of 2012, "there was no evidence of [the flashbacks] being a problem until [the] therapy sessions [in August of 2012] started." (*See* R. 75–76.)

### d. Additional evidence

#### i. Diane Pyram

On May 2, 2011, Plaintiff's "case manager" at Arbor WeCare, Diane Pyram, completed a "function report" as part of Plaintiff's application for SSI.[16]  (R. 213–22.)  Plaintiff reported that her daily activities included caring for her infant son, watching the news, showering, taking her son outside, performing daily errands, and cleaning her apartment.  (R. 213–14, 216.)  She cooked "light" meals every other day.  (R. 216.)  She shopped in stores twice per week, went outside daily, and was able to use public transportation.  (R. 217.)  Plaintiff had no problem with personal care and did not need reminders to take medication or care for herself.  (R. 215–16.)  Plaintiff reported cutting herself and pulling out her hair on a daily basis.  (R. 213–14.)  She did not socialize with others and isolated herself, although she attended doctor appointments, local stores, and a substance abuse program.  (R. 218.)  She reported difficulty completing tasks, concentrating, and getting along with others, and stated that she experienced "racing thoughts throughout the day forcing her to remain in a depressive state."  (R. 219.)  Plaintiff was able to concentrate on completing daily tasks although she became distracted throughout the day.  (R. 219.)  She was able to follow written and spoken instructions and Ms. Pyram noted that Plaintiff adhered to written instructions during the meeting.  (R. 219.)  Plaintiff's conditions did not impact her ability to "get along" with authority figures.  (R. 220.)  She did not handle stressful situations well and reported that she cried, cut herself, and pulled her hair out in response to stress.  (R. 220.)  Changes in her routine caused her to become agitated and annoyed.

---

[16]  Based on the responses to questions regarding the nature and duration of Ms. Pyram and Plaintiff's relationship, it appears that Ms. Pyram had not known Plaintiff prior to spending two hours with Plaintiff to complete the report, and the answers provided are based on Plaintiff's statements.  (R. 213.)

(R. 220.)

### ii.   Function and disability reports completed by Plaintiff

On July 4, 2011, Plaintiff completed a "function report." (R. 238–50.) She reported that her daily activities were caring for her son, performing errands, preparing dinner, bathing and having "manic" episodes. (R. 239.) She prepared meals daily or every other day, washed dishes, and did laundry. (R. 240–41.) Her impairments interfered with her ability to "drive, concentrate, focus, read [and] go to social functions." (R. 239.) Her impairments did not affect her sleep and she had no problem with personal care. (R. 239.) She did not need special reminders to take medications or care for herself. (R. 240.) She went outside daily, could use public transportation, and shopped in stores. (R. 241–42.) She indicated that although yoga was one of her hobbies, she "no longer want[ed] to be around people so no more yoga." (R. 242–43.) As to her social activities, Plaintiff reported that she "shut down social[ly]" and, while she "used to go out often," she no longer did so. (R. 243.) She went to church once a month and did not have any problems getting along with family, friends, neighbors, or others. (R. 243.) She once was fired from a job because she "told off [her] boss." (R. 245.) She had difficulty paying attention, but could finish what she started, follow written and spoken instructions, and had no trouble with remembering things. (R. 245–46.) She reported that "stress ma[de] [her] agitated and then [her] depression [would] kick in." (R. 246.)

In a November 10, 2011 "disability report," Plaintiff indicated that her "condition ha[d] worsen[ed] even with medications." (R. 264, 268 (indicating date on which report was submitted).) Plaintiff also reported that her daily activities had changed since her last disability

report,[17] and she went "out to appointments only." (R. 267.)

### iii.   Testimony of vocational expert Andrew Pasternak

Andrew Pasternak, a vocational expert, also testified at the hearing. (R. 76–81.) The vocational expert classified Plaintiff's past jobs as customer service representative, administrative clerk and limo driver. (R. 77–78.) The ALJ then asked the vocational expert to consider a hypothetical individual of the same age and with the same education and work experience as Plaintiff. (R. 78–79.) The vocational expert was told that the hypothetical individual could lift and carry fifty pounds occasionally and twenty-five pounds frequently; sit, stand, or walk for up to six hours in an eight-hour workday; was unable to climb ladders, ropes, or scaffolds; and could occasionally use ramps and stairs. (R. 78–79.) The hypothetical individual was further limited to only simple, repetitive, and routine tasks in a low stress environment without fast-paced work or production quotas with only occasional contact with co-workers and supervisors and no contact with the general public. (R. 78–79.) The vocational expert testified that such an individual could perform unskilled medium jobs in representative occupations such as vehicle cleaner, with 8,500 such jobs in the regional economy and 174,000 such jobs in the national economy; hand packager, with 10,400 such jobs in the regional economy and 164,800 such jobs in the national economy; and machine tender/operator, with 11,400 such jobs in the regional economy and 117,000 in the national economy. (R. 78–79.)

### e.   The ALJ's April 2, 2013 decision

The ALJ conducted the five step sequential analysis as required by the Social Security Administration under the authority of the Social Security Act (the "SSA"). First, the ALJ found

---

[17]   Based on the record, it appears that before submitting the November 10, 2011 "disability report," Plaintiff submitted a "disability report" in May of 2011. (*See* R. 223–29.)

that Plaintiff had not engaged in substantial activity since May 3, 2011, the date of her application.  (R. 11.)  Second, the ALJ found that Plaintiff had the following severe impairments: "major depressive disorder without psychotic features[;] alcohol and substance abuse in early, partial/possible remission[;] alcohol induced mood disorder[;] borderline personality disorder[;] and anxiety disorder."[18]  (R 11.)

Third, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or was equal to the severity of one of the impairments listed in Appendix 1 of the Social Security Regulations.  (R. 11.)  The ALJ considered Listings 12.04 (Affective Disorders), 12.06 (Anxiety Related Disorders), 12.08 (Personality Disorders), and 12.09 (Substance Addiction Disorders).  (R. 12.)  The ALJ found that Plaintiff had a "mild" restriction in her activities of daily living.  (R. 12.)  The ALJ found that Plaintiff had "moderate" difficulties with social functioning and concentration, persistence or pace.  (R. 12.)  He concluded that Plaintiff had experienced three episodes of decompensation, each of extended duration.  (R. 12.)  However, even though Plaintiff had experienced three episodes of decompensation, each of extended duration, the ALJ concluded that the paragraph B criteria was not satisfied because Plaintiff's impairments did not cause any "marked" limitations or difficulties.  (R.12.)

Next, the ALJ determined that Plaintiff "has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c)."  (R. 12.)  The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected" to cause Plaintiff's symptoms, but found that Plaintiff's statements concerning the "intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained."  (R. 18.)

---

[18]  The ALJ found that Plaintiff's migraine headaches and hemorrhoids were not severe impairments.  (R. 11.)

The ALJ found Plaintiff "to be not generally credible to the extent that she is incapable of working," and he concluded that "[a]lthough the record does show some vocational limitations, they did not preclude all work as evidenced by [Plaintiff's] abilities as established by the record and testimony." (R. 18.) Specifically, the ALJ concluded that Plaintiff could perform "the full range of medium work" subject to certain "non-exertional limitations." (R. 19.) The ALJ found that Plaintiff "is limited to simple, repetitive, routine tasks that are low stress" and is not capable of performing jobs that are either "fa[st] paced" or "require[] production quotas." (R. 12.) The ALJ also found that Plaintiff "is limited to occasional contact with co-workers and supervisors and no contact with the general public."[19] (R. 12.)

The ALJ noted that from December 22, 2010 through September 28, 2011, Plaintiff attended, and successfully completed, "an outreach project for detox and rehabilitation" which she initially attended four days per week, and later attended two days per week. (R. 18.) In addition, the ALJ noted that Plaintiff "had significant activities of daily living as she cared for her 2 year old son . . . , took public transportation on a regular basis, bathed, dressed, and groomed herself, shopped at least 2 times per week, cooked daily, cleaned, did laundry, and attended AA meetings weekly." (R. 18.) With respect to Plaintiff's "maladaptive behavior (e.g. cutting herself and pulling of the hair)," the ALJ noted that "although this behavior was not a positive coping strategy," Plaintiff's "treating therapist and psychiatrist did not recommend a

---

[19]  The ALJ's complete findings as to Plaintiff's capabilities are as follows:
She can lift/carry 50 pounds occasionally, 25 pounds frequently. She can sit for 6 hours and stand/walk for 6 hours in an 8-hour workday. She cannot climb ropes, ladders, or scaffolds, but can frequently use ramps and stairs. She is limited to simple, repetitive, routine tasks that are low stress, not fa[st] paced or involve a job that requires production quotas. She is limited to occasional contact with co-workers and supervisors and no contact with the general public.
(R. 12.)

higher level of care," such as "intensive outpatient programs, emergency room visits, [or] inpatient care," and the ALJ found that this indicated "the problem was not very serious." (R. 18.)  The ALJ also noted that neither of the consultative examiners, Dr. Friedman and Dr. Kyle, "made any mention of any evidence that [Plaintiff] had been cutting herself."  (R. 18.)

In reaching the foregoing conclusions, the ALJ accorded "great weight" to the opinion of the medical expert, Dr. Efobi, because "it was well reasoned, and supported by the record as a whole."  (R. 18.)  The ALJ also accorded "great weight" to the opinion of Dr. Friedman, one of the consultative examiners, because Dr. Friedman "evaluated [Plaintiff] prior to making the opinion, and the opinion was consistent with [Dr. Friedman's] evaluation and the other evidence of record as taken as a whole."  (R. 18.)

The ALJ accorded "significant weight" to "the residual functional capacity filed by the Outreach Project" because "it was consistent with the evidence of record" and was "made during the course of [Plaintiff] rehabilitation program."  (R. 18.)  The ALJ also accorded "significant weight" to the opinion of medical consultant Dr. Kudler because "it was supported by the record."  (R. 18.)  The ALJ accorded "some weight" to the opinion of consultative examiner Dr. Kyle because although "it reflected a lack of physical limitations," Plaintiff "did not allege any physical limitations."  (R. 19.)

The ALJ accorded "some weight" to the "residual functional capacity assessment" prepared by Dr. Caskey because the severity of the limitations set forth in Dr. Caskey's opinion "were not consistent with the evidence of record, including [Plaintiff's] testimony" regarding "what she was capable of completing on a daily basis."  (R. 18–19.)  The ALJ also found that Dr. Caskey's opinion as to Plaintiff's abilities and limitations was "internally inconsistent" because "Dr. Caskey's findings of a marked disability completely contradict[ed] her observations [as to]

[Plaintiff's] abilities" and "[t]his occur[red] throughout [Dr. Caskey's] exam and review."

(R. 19.)  Specifically, the ALJ noted that, in evaluating Plaintiff's "sustained concentration and

persistence," Dr. Caskey concluded that "there was no evidence of any limitation in the areas of

[Plaintiff's] ability to perform activities within a schedule, maintain regular attendance and be

punctual within customary tolerances and to sustain an ordinary routine without special

supervision."  (R. 19.)  The ALJ further noted that, despite Dr. Caskey's foregoing conclusions,

"later in her opinion, she found that [Plaintiff] had marked limitations in the ability to complete a

normal workday and workweek without interruptions from psychologically based symptoms and

to perform at a consistent pace without an unreasonable number and length of rest periods."

(R. 19.)

Finally, the ALJ determined that Plaintiff was not capable of performing her prior

relevant work as a customer service representative, administrative clerk and limo driver, given

"the requirement that [Plaintiff] have no contact with the general public and not be a part of a

fast paced, or production oriented work environment."  (R. 19.)  The ALJ concluded that,

"[b]ased on the testimony of the vocational expert," and considering Plaintiff's "age, education,

work experience, and residual functional capacity, [Plaintiff] is capable of making a successful

adjustment to other work that exists in significant numbers in the national economy."  (R. 20.)

As a result, the ALJ concluded that a "finding of 'not disabled'" was appropriate.  (R. 20.)

Therefore, the ALJ determined that, during the period from May 3, 2011 to the date of the

decision, Plaintiff was not suffering from a "disability" as this term is defined under the SSA.

(R. 20.)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted). If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'"

*McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008)

(alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b. Availability of benefits

SSI is available to, among others, individuals who are "disabled" within the meaning of

the Act.[20]  For purposes of SSI eligibility, to be considered disabled under the Act, a plaintiff

must establish his or her inability "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than twelve

months."  42 U.S.C. § 1382c(a)(3)(A).  The impairment must be of "such severity that he is not

only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national

economy."  *Id.* § 1382c(a)(3)(B).  The Commissioner has promulgated a five-step analysis for

evaluating disability claims.  20 C.F.R. § 416.920.  The Second Circuit has described the steps as

follows:

> The first step of this process requires the [Commissioner] to
> determine whether the claimant is presently employed.  If the
> claimant is not employed, the [Commissioner] then determines
> whether the claimant has a "severe impairment" that limits her
> capacity to work.  If the claimant has such an impairment, the
> [Commissioner] next considers whether the claimant has an
> impairment that is listed in Appendix 1 of the regulations.  When
> the claimant has such an impairment, the [Commissioner] will find
> the claimant disabled.  However, if the claimant does not have a
> listed impairment, the [Commissioner] must determine, under the
> fourth step, whether the claimant possesses the residual functional
> capacity to perform her past relevant work.  Finally, if the claimant
> is unable to perform her past relevant work, the [Commissioner]
> determines whether the claimant is capable of performing any other

---

[20] SSI is available to individuals who are sixty-five years of age or older, blind or disabled and meet certain income requirements.  42 U.S.C. §§ 1382(a), 1382c(a)(1)(A); 20 C.F.R. § 416.202.  The only issue before the Court is whether Plaintiff is disabled.

work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (describing "the five-step, sequential evaluation process used to determine whether a claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v).)).

### c. Analysis

The Commissioner moves for judgment on the pleadings, arguing that the ALJ's determination that Plaintiff was not disabled was supported by substantial evidence. (Comm'r Mem. 18–24.) Plaintiff cross-moves for judgment on the pleadings, arguing that the evidence in the record demonstrates that Plaintiff was disabled and the ALJ erred in (1) failing to list PTSD, trichotillomania and "self-harm" among Plaintiff's severe impairments at step two of the sequential analysis, (Pl. Mem. 24), (2) failing to consider any evidence from Arbor WeCare, (*id.* at 17–20), (3) failing to provide "good reasons" for according only some weight to the opinion of Dr. Vanessa Caskey, Plaintiff's treating physician, (*id.* at 26–28), (4) relying on the medical expert testimony of Dr. Chufameka Efobi, (*id.* at 20–23), (5) according significant weight to an undated and unsigned form completed by Outreach Project, (*id.* at 25), and (6) according significant weight to the opinion of Dr. P. Kudler, the consultative examiner, (*id.* at 23).

### i. Failure to list PTSD, trichotillomania and self-harm among Plaintiff's severe impairments at step two of the sequential analysis

Plaintiff argues that the ALJ erred because, at the second step of the sequential analysis, he did not find PTSD, trichotillomania and "self-harm" to be among Plaintiff's severe impairments. (Pl. Mem. 24.) The Commissioner argues that, because the ALJ identified other severe impairments at the second step such that the sequential evaluation proceeded, any error in

the ALJ's analysis at step two was harmless.[21]  (Comm'r Reply 3–4.)

At the second step of the sequential analysis, the ALJ must determine whether the plaintiff has a severe impairment that significantly limits the plaintiff's physical or mental ability to do basic work activities.  *See* 20 C.F.R. § 416.920(c).  The plaintiff bears the burden to provide medical evidence demonstrating the severity of her condition.  *Miller v. Comm'r of Social Sec.*, No. 05-CV-1371, 2008 WL 2783418, at *6–7 (N.D.N.Y. July 16, 2008); *see also* 20 C.F.R. § 416.912(a).  Although the Second Circuit has held that the second step is limited to "screen[ing] out *de minimis* claims," *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995), the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, by itself, sufficient to render a condition "severe," *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995).

Where an ALJ excludes certain impairments from the list of severe impairments at the second step, any such error is harmless where the ALJ identifies other severe impairments such that the analysis proceeds and the ALJ considers the effects of the omitted impairments during subsequent steps.  *See O'Connell v. Colvin*, 558 F. App'x 63, 65 (2d Cir. 2014) (finding that any error by the ALJ in excluding the claimant's knee injury as a severe impairment was harmless because the ALJ identified other severe impairments and considered the knee injury in subsequent steps); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (finding that any error by the ALJ in excluding claims of anxiety disorder and panic disorder from step two

---

[21]   The Commissioner also argues that Plaintiff failed to meet her burden to present evidence showing that PTSD, trichotillomania and "self-harm" constituted severe impairments. (Comm'r Reply 3.)  For the reasons explained above, the Court concludes that even if the ALJ did err in excluding PTSD, trichotillomania and "self-harm" from the list of Plaintiff's severe impairments at the second step, any such error was harmless.  As such, the Court does not address the sufficiency of the evidence as to the severity of Plaintiff's PTSD, trichotillomania and "self-harm" behavior for purposes of the second step.

would be harmless because the ALJ identified other severe impairments and specifically considered the claims of anxiety and panic attacks in subsequent steps (citing *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010))); *Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) (finding remand would not be warranted due to the ALJ's failure to recognize disc herniation as a severe impairment because "the ALJ did identify severe impairments at step two, so that [plaintiff's] claim proceeded through the sequential evaluation process" and the ALJ considered the "combination of impairments" and "all symptoms" in making determination); *Lasiege v. Colvin*, No. 12-CV-1398, 2014 WL 1269380, at *10–11 (N.D.N.Y. Mar. 25, 2014) (holding that, even if the ALJ erred in failing to list headaches as severe impairment at step two, such error was harmless because other severe impairments were found and the ALJ explicitly noted claimant's headaches during RFC determination).

The ALJ made no mention of PTSD, trichotillomania or self-harm — or any of the behaviors or symptoms described with respect to these impairments — at the second step. (R. 11.) Rather, the ALJ found that Plaintiff's "major depressive disorder without psychotic features[;] alcohol and substance abuse in early, partial/possible remission[;] alcohol induced mood disorder[;] borderline personality disorder[;] and anxiety disorder" constituted severe impairments, whereas Plaintiff's migraine headaches and hemorrhoids were not severe impairments. (R. 11.) Although the ALJ did not find PTSD, trichotillomania or self-harm to be severe impairments, or otherwise mention these conditions at the second step, the ALJ's analysis at the subsequent steps indicates that "all symptoms" were considered including Plaintiff's PTSD diagnosis and flashbacks as well as her reports of pulling out her hair and cutting herself. (*See* R. 12 (noting, at third step, that medical expert opined on the severity of Plaintiff's mental impairments "considered singly and in combination," and that, in determining RFC, the ALJ

"considered all symptoms"); R. 13 (noting PTSD diagnosis, trichotillomania and self-harm behavior, and the ALJ's observation when Plaintiff removed her wig); R. 14 (noting trichotillomania, self-harm and flashbacks); R. 15–16 (same); R. 18 (same).) Therefore, because the ALJ's decision demonstrates that he considered PTSD, trichotillomania and self-harm in subsequent steps, any error in failing to list these impairments as severe impairments at step two was harmless. *See O'Connell*, 558 F. App'x at 65; *Reices-Colon*, 523 F. App'x at 798; *Stanton*, 370 F. App'x at 233 n.1.

### ii. Evaluation of medical evidence

### 1. General principles

### A. Treating physician rule

Under the Social Security Regulations, a "treating source" is defined as a plaintiff's "own physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 416.902; *see also Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011). "[A] treating physician's statement that the claimant is disabled cannot itself be determinative." *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same). However, a treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record." 20 C.F.R. § 404.1527(c)(2); *see Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him

in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

When a treating source opinion swims upstream, contradicting other substantial evidence, such as the opinions of other medical experts, it may not be entitled to controlling weight. *See Williams v. Commissioner of Soc. Sec.*, 236 F. App'x 641, 643–44 (2d Cir. 2007); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). A treating physician's opinion may also be discounted when it is internally inconsistent. *See Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012).

An ALJ must consider a number of factors to determine the amount of weight to assign to a treating physician's opinion, specifically: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2) and discussing the factors). The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion. *Halloran*, 362 F.3d at 32. While the ALJ is not required to discuss the factors explicitly, it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)). Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012);

*see also Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians['] opinion . . . .").

### B. Other medical source evidence including evidence from examining and non-examining consultants

Under the statute, a "nontreating source" is defined as a "physician, psychologist, or other acceptable medical source who has examined [the plaintiff] but does not have, or did not have, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 416.902. A "nonexamining source" is defined as "a physician, psychologist, or other acceptable medical source who has not examined [the plaintiff] but provides a medical or other opinion in [the] case." 20 C.F.R. § 416.902. Where the ALJ decides to give less than controlling weight to a treating physician's opinion, and the opinions of nontreating and nonexamining sources are considered, the weight to which such evidence is entitled depends upon the following factors prescribed by regulation: "(1) the length, nature, and extent of the relationship between the claimant and the physician; (2) the supportability of the physician's opinion; (3) the consistency of the physician's opinion with the record as a whole; and (4) the specialization of the physician providing the opinion." *Rodriguez v. Colvin*, No. 13-CV-7607, 2015 WL 1903146, at *16 (S.D.N.Y. Mar. 31, 2015) (citing 20 C.F.R. § 416.927(c)(2)–(5)). "An ALJ may also consider 'other factors . . . which tend to support or contradict the opinion,' such as 'the amount of understanding of [the] disability programs and their evidentiary requirements that an acceptable medical source has,' and 'the extent to which an acceptable medical source is familiar with the other information in [a claimant's] case record.'" *Rodriguez*, 2015 WL 1903146, at *16 (citing 20 C.F.R § 416.927(c)(6)). In assessing the length, nature and extent of the relationship between the claimant and the physician for purposes of the first factor, "[g]enerally, . . . more weight [is given] to the opinion of a source who has examined [the plaintiff] than to the opinion of a source

who has not examined [the plaintiff]." 20 C.F.R. § 416.927(c)(1); *see Filocomo v. Chater*, 944 F. Supp. 165, 170 n.4 (E.D.N.Y.1996) ("[T]he conclusions of a physician who merely reviews a medical file and performs no examination are entitled to little if any weight.").

However, "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419. In particular, "[i]n the case of mental disabilities, '[t]he results of a single examination may not adequately describe [the claimant's] sustained ability to function" and thus it is "vital" to "review all pertinent information relative to [the claimant's] condition, especially at times of increased stress." *Corporan v. Comm'r of Soc. Sec.*, No. 12-CV-6704, 2015 WL 321832, at *28 (S.D.N.Y. Jan. 23, 2015) (second, third and fourth alterations in original) (quoting 20 C.F.R. Pt. 404, subpt. P, App 1 § 12.00(E)); *see Hernandez v. Astrue*, 814 F. Supp. 2d 168, 182–83 (E.D.N.Y. 2011) ("[T]he opinion of a consultative physician, 'who only examined a plaintiff once, should not be accorded the same weight as the opinion of [a] plaintiff's treating psychotherapist.' This is because 'consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.'" (citations omitted)); *Anderson v. Astrue,* No. 07-CV-4969, 2009 WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009) ("Generally, the opinion of a consultative physician, who only examined plaintiff once, should not be accorded the same weight as the opinion of plaintiff's treating psychotherapist."); *see also Roman v. Astrue,* No. 10-CV-3085, 2012 WL 4566128, at *18 (E.D.N.Y. Sept. 28, 2012) ("Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health." (quoting *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 342 (E.D.N.Y. 2010))).

### C. The ALJ's duty to develop the record

Although a "claimant has the general burden of proving that he or she has a disability within the meaning of the Act, . . . 'because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (alteration omitted) (first citing *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002); and then quoting *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999)); *see also Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) ("Unlike a judge at trial, the ALJ has a duty to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" (quoting *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011))). Pursuant to the ALJ's duty to develop the record, the ALJ must attempt to fill gaps in the record. *See Rosa v. Callahan*, 168 F.3d 72, 79 & n.5 (2d Cir. 1999) (explaining that the ALJ must attempt to fill "clear gaps" in the record, but "where there are no obvious gaps . . . and where the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional information); 20 C.F.R. § 416.912(d)(2) (requiring the ALJ to develop claimant's complete medical history). This duty is present "[e]ven when a claimant is represented by counsel." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (collecting cases); *see Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) ("[T]he ALJ's general duty to develop the administrative record applies even where the applicant is represented by counsel . . . ."); *Doria v. Colvin*, No. 14-CV-7476, 2015 WL 5567047, at *7 (S.D.N.Y. Sept. 22, 2015) ("The ALJ's duty to develop the record includes a duty to resolve apparent ambiguities relevant to the ALJ's disability determination." (citation omitted)); *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 279 (N.D.N.Y. 2009) ("[A]n ALJ has an affirmative duty to develop the record, even if the claimant is represented by counsel, if the medical record is

ambiguous or incomplete." (first citing *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); and then citing *Rosa*, 168 F.3d at 79)).

<h3 style="text-align:center">2.     Failure to consider Arbor WeCare records</h3>

Plaintiff argues that the ALJ failed to consider, or even reference, the records from Arbor WeCare and claims that "[t]he ALJ's failure to consider Plaintiff's treatment through Arbor WeCare requires remand." (Pl. Mem. 17.) Plaintiff contends that the Arbor WeCare records are probative and supportive of Plaintiff's claim and cites the February 2010 BPS summary, Dr. Gordon's December 9, 2010 psychological evaluation, and Dr. Witek's February 3, 2011 report. (*Id.*) Plaintiff also argues that included among the Arbor WeCare records are four medical source opinions that the ALJ ignored and that are inconsistent with the ALJ's RFC determination. (*Id.* at 18.) Specifically, Plaintiff cites Dr. Gordon's December 9, 2010 evaluation, Dr. Seidman's evaluation on December 13, 2010, and the records reflecting Dr. Hussain's conclusions in February and April of 2011. (*Id.*) Plaintiff also argues that, because "it appears that Dr. Hussain examined Plaintiff on at least two occasions, and . . . referred Plaintiff for additional testing, he likely qualifies as a treating physician," such that the ALJ's failure to consider his opinion requires remand. (*Id.* at 19 (internal citations to the record omitted).) Finally, Plaintiff argues that, while the NYC HRA's April 22, 2011 determination that Plaintiff was unable to work was not binding on the ALJ, the ALJ was nonetheless required to consider and assess the NYC HRA's decision. (*Id.* at 20.)

The Commissioner argues that an ALJ's failure to cite specific evidence does not mean such evidence was not considered and that an ALJ is not categorically required to explain why he considers particular evidence unpersuasive. (Comm'r Reply 2.) The Commissioner further argues that the Arbor WeCare records pre-date the relevant period for purposes of Plaintiff's

claim, which began as of the date she filed her application. (*Id.* at 3.) As to the evaluation by

Dr. Seidman, the Commissioner argues that, in addition to being outside of the relevant period,

the records related to Dr. Seidman's evaluation are not themselves included in the record, and

Plaintiff's argument is instead based on a reference to such records in the "function report"

prepared by Plaintiff's Arbor WeCare case manager, Diane Pyram. (*Id.*) The Commissioner

also argues that Dr. Hussain's opinion, that Plaintiff was unable to work as of particular periods,

and the NYC HRA determination that Plaintiff was unable to work, constitute opinions on issues

reserved to the Commissioner. (*Id.* at 3–4.)

The relevant period for purposes of a plaintiff's claim for SSI benefits is from the date on

which the plaintiff's application is filed to the date of the ALJ's decision. *See Frye ex rel. A.O.*

*v. Astrue*, 485 F. App'x 484, 485 n.1 (2d Cir. 2012) (stating that "relevant period" for purposes

of appeal challenging ALJ's denial of claimant's SSI application was from date on which SSI

application was filed to date of ALJ's decision); *Mendez ex rel. E.V. v. Astrue*, No. 11-CV-4297,

2013 WL 1686485, at *10 (E.D.N.Y. Apr. 18, 2013) ("The relevant time period begins with

plaintiff's application for SSI benefits . . . and ends on the date the ALJ issued his

decision . . . ."); *Pozzouli v. Astrue*, No. 07-CV-0414, 2008 WL 4107169, at *7 (N.D.N.Y.

Aug. 28, 2008) ("The rule for payment of SSI benefits . . . is clear; payment of benefits can begin

no earlier than the first month following the month the application is filed. Even if a claimant

met all the requirements for SSI benefits earlier than the month in which the application was

filed and could have been disabled under the Act, benefits cannot be paid for months that

pre-date the first month after the filing of the application." (citations omitted)).

Although the period in which a plaintiff can receive benefits does not commence until

after the date on which the plaintiff's SSI application is filed, the ALJ is nonetheless obligated to

develop an SSI claimant's complete medical records and history for at least the twelve months preceding the month in which the claimant's application is filed. *See* 20 C.F.R. § 416.912(d) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary . . . .").

In the instant case, Plaintiff filed her SSI application on May 3, 2011, (R. 187–93), and the ALJ issued his decision on April 2, 2013, (R. 9–21). The records from Arbor WeCare include medical records dating from February 1, 2010 to April 22, 2011, (*see* R. 317–479), and the third-party function report completed by Diane Pyram in support of Plaintiff's SSI application on May 2, 2011, (*see* R. 213–222). While the Arbor WeCare records pre-date the period for which Plaintiff is potentially entitled to receive SSI benefits, because the ALJ was statutorily required to develop Plaintiff's medical records from May of 2010, the Arbor WeCare records are relevant to Plaintiff's SSI application. Having concluded that the Arbor WeCare records were relevant to Plaintiff's SSI application, the Court considers whether the Arbor WeCare records undermine, or are inconsistent with, the ALJ's decision.

The Court notes that although the ALJ did not refer or cite to the Arbor WeCare records in his decision, the ALJ's failure to cite to the Arbor WeCare records does not indicate that he failed to consider them. *See Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted" and "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." (citations omitted) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998))). Furthermore, having reviewed the Arbor WeCare records including the specific records cited by Plaintiff, the Court has no basis to find that the Arbor

WeCare records undermine or are inconsistent with the ALJ's decision.

However, the Court notes that the record does not appear to include the "[p]sychiatrist wellness plan report dated 4/07/2011" which is referenced in Dr. Hussain's April 22, 2011 comments within the Arbor WeCare records. (R. 432.) Based on Dr. Hussain's notes, the missing April 7, 2011 report "indicated that [Plaintiff] [was] unlikely to be able to work within the next 12 months due to the need for further management of [postpartum] depression, r/o major depressive disorder and r/o adjustment disorder with depressed mood." (R. 432.) Because Dr. Hussain's notes indicate that the April 7, 2011 report discusses Plaintiff's abilities during the relevant SSI disability period, pursuant to his duty to the develop the record, the ALJ was obligated to follow up regarding the April 7, 2011 report and attempt to obtain a copy of it. *See, e.g.*, *Rosa*, 168 F.3d at 79. There is no indication in the record that the ALJ did so. While the Court is not remanding the case as a result of the ALJ's failure to develop the record as to the April 7, 2011 report, because, for the reasons discussed below, the Court remands this case in light of the undated and unsigned Outreach Project record, on remand, the ALJ is directed to attempt to obtain the April 7, 2011 "psychiatrist wellness plan report" referenced in the Arbor WeCare records.

### 3. Treating physician Dr. Caskey

Plaintiff argues that the ALJ erred in failing to provide "good reasons" for assigning only "some weight" to the opinion of Dr. Caskey, Plaintiff's treating psychologist. (Pl. Mem. 26–28.) The Commissioner argues that the ALJ properly granted only "some weight" to Dr. Caskey's opinion because the ALJ found that Dr. Caskey's opinion was "not consistent with the evidence of record, including Plaintiff's testimony" and that Dr. Caskey's opinion was "internally inconsistent." (Comm'r Reply 8; Comm'r Mem. 20–21.)

After considering the factors noted above, "the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'" *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Harris v. Colvin*, No. 15-CV-6104, 2016 WL 736452, at *2 (W.D.N.Y. Feb. 25, 2016) (stating that the "good reasons" set forth in support of weight assigned to treating physician must be "sufficiently specific" (citing *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009))).

In his decision, the ALJ stated that he accorded Dr. Caskey's opinion "some weight" because her opinion as to the severity of Plaintiff's limitations was inconsistent with the other evidence in the record and was internally inconsistent. (R. 18–19.) The ALJ specified that, "Dr. Caskey's opinion set forth more severe limitations that were not consistent with the evidence of record, including the claimant's testimony of what she was capable of completing on a daily basis (e.g. caring for her son and his needs, maintaining her apartment, and caring for herself as set forth above)." (R. 18–19.) As to the internal inconsistencies, the ALJ explained stating:

> Dr. Caskey's opinion as to what the claimant's abilities and limitations were, was internally inconsistent, as she found that, in the area of sustained concentration and persistence, there was no evidence of any limitation in the areas of the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances and to sustain an ordinary routine without special supervision. However, later in her opinion, she found that [Plaintiff] had marked limitations in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

(R. 19.) The ALJ also states that, "Dr. Caskey's findings of a marked disability completely contradict her observations of the claimant's abilities. This occurs throughout her exam and review." (R. 19.)

The ALJ did not err in assigning only "some weight" to Dr. Caskey's opinion, and he

satisfied his obligation to provide "good reasons" for doing so. First, the ALJ sufficiently explained the basis for his decision to assign Dr. Caskey's opinion "some weight" such that the Court was able to glean the ALJ's rationale and confirm that it was appropriate. Second, the ALJ's decision to accord only "some weight" to Dr. Caskey's opinion — because it was internally inconsistent and inconsistent with other portions of the record — was supported by substantial evidence. *See Micheli*, 501 F. App'x at 28 (concluding that ALJ properly declined to accord controlling weight to claimant's treating physician where treating physician's opinions were internally inconsistent and inconsistent with other record evidence).

For example, while Dr. Caskey opined that Plaintiff was "without resources to cope with emotional stressors and barely able to manage her daily chores," (R. 553), Plaintiff's own testimony demonstrates that she was solely responsible for caring for her infant son and that she handled a range of chores on a daily basis, (*see* R. 36–41). In addition, while Dr. Caskey opined that Plaintiff was "markedly limited" in her ability to travel to unfamiliar places or use public transportation, (R. 552), Dr. Caskey also noted that Plaintiff was able to travel alone on a daily basis by both bus and subway, (R. 560).

Plaintiff also argues that the ALJ's assessment was flawed because the ALJ appears to have understood Exhibit 10F to consist of only one document associated with Dr. Caskey whereas Exhibit 10F actually consists of two distinct documents — the September 10, 2012 report by Drs. Caskey and Rosenberg and the September 12, 2012 assessment by Dr. Caskey. (Pl. Mem. 27; *see also* R. 551–53 (Sept. 12, 2010 "mental residual functional capacity assessment" signed by Dr. Caskey), R. 554–60 (Sept. 10, 2012 "physician's report for claim of disability due to mental impairment).) Plaintiff contends that the ALJ "did not assess the September 10 treating source opinion or even mention Plaintiff's treatment with Dr. Rosenberg."

(Pl. Mem. 27.)  In response, the Commissioner argues that the ALJ "properly considered both opinions as the 'residual functional capacity assessment' and associated them both to Dr. Caskey."  (Comm'r Reply 8.)

In his decision, the ALJ describes Exhibit 10F as "Dr. Caskey's residual functional capacity assessment," and it is possible that the ALJ understood Exhibit 10F to be a single form. (R. 18; *see also* R. 15 ("The record contained a mental residual functional capacity assessment by Treating Psychologist Vanessa Caskey, Psy.D., completed on September 12, 2012 (Exhibit 10F).").)  However, the ALJ's decision does show that the ALJ reviewed both documents that were a part of Exhibit 10F because the ALJ cites to both the September 10, 2012 report by Drs. Caskey and Rosenberg and the September 12, 2012 assessment by Dr. Caskey.  (*See* R. 15 (citing information set forth in first document at Ex. 10F), R. 16 (citing information set forth in second document at Ex. 10F).)  Therefore, the ALJ did not err by failing to consider the September 10, 2012 report and the opinion of both Dr. Caskey and Dr. Rosenberg stated therein.

### 4.    Medical expert Dr. Efobi

Plaintiff argues that the ALJ erred in relying on the medical expert testimony of Dr. Efobi based on two main arguments.  (Pl. Mem. 20–23.)  First, Plaintiff contends that, as a matter of law, the ALJ erred in relying on, and according "great weight" to, Dr. Efobi's testimony given his status as a non-treating and non-examining physician.  (*Id.* at 20–21, 23.)  Second, Plaintiff argues that Dr. Efobi's testimony was only entitled to little to no weight because his testimony "displayed a[] deficient understanding of the evidence of record and his opinions were not well-supported."  (*Id.* at 21–23.)  Each argument is addressed below.

### A.    Legitimacy of medical expert testimony

Plaintiff argues that, as a matter of law, the ALJ erred in "rely[ing] exclusively" on Dr.

Efobi's opinion at the third step of the sequential analysis and in according Dr. Efobi's opinion "great weight" in assessing Plaintiff's RFC because Dr. Efobi did not examine Plaintiff and merely reviewed the record. (*Id.*) Plaintiff contends that the ALJ's reliance on Dr. Efobi's testimony was particularly problematic because Plaintiff's impairments are psychiatric and the opinion of a non-treating, non-examining physician should not be accorded significant weight in such cases. (*Id.* at 21.) The Commissioner argues that an ALJ is entitled to solicit and consider the opinion of a medical expert as to whether a claimant's impairments satisfy a listing at step three and as to the RFC finding. (Comm'r Reply 6.)

The regulations allow an ALJ to consider opinions from medical experts as to the nature and severity of a claimant's impairments and as to whether a claimant's impairments equal the requirements of any impairment in the listings. *See* 20 C.F.R. § 416.927(f)(iii). As such, "[i]t is not per se legal error for an ALJ to give greater weight to a consulting opinion than a treating opinion." *See Rosier v. Colvin*, No. 13-CV-4490, 2014 WL 5032325, at *2 (2d Cir. Oct. 9, 2014) (summary order). Therefore, the ALJ's reliance on Dr. Efobi's testimony was not categorically erroneous because of Dr. Efobi's status as a non-treating and non-examining source.

## B. Consistency between medical expert testimony and record

Plaintiff also argues that Dr. Efobi's opinion was only entitled to little to no weight because his testimony "displayed a[] deficient understanding of the evidence of record and his opinions were not well-supported." (Pl. Mem. 21–23.) Plaintiff specifically argues that Dr. Efobi's testimony about the severity of Plaintiff's self-injurious behavior was inconsistent with the record. (*Id.* at 22.) Plaintiff also argues that Dr. Efobi's testimony about the severity of her PTSD diagnosis and flashbacks was inconsistent with the record. (*Id.* at 21–22.) Each argument

is addressed below.

### (1)   Severity of self-harm behavior

Plaintiff argues that, although Dr. Efobi testified that in reviewing the record "he didn't see any concerns that jumps out with regard to the therapist or the doctor when it comes to [Plaintiff's self-injurious] behavior," in fact, the "record is replete with evidence of treating sources' concern with Plaintiff's self-harm." (Pl. Mem. 22.)  In response, the Commissioner argues that Dr. Efobi's analysis of Plaintiff's self-injurious behavior was consistent with the record and he "reasonably considered that Plaintiff's therapist or doctor did not recommend a higher level of care." (Comm'r Reply 6.)

During the administrative hearing, Dr. Efobi testified that, while he did not doubt the veracity of Plaintiff's testimony as to the frequency with which she cut herself and pulled out her hair, he concluded that Plaintiff's self-injurious behavior was "not that severe." (R. 55.)  He testified that "usually[,] self-mutilating behavior of severity [involves] cutting [the] wrist or [] skin" to an extent that concerns about the patient's "dangerousness to self" are triggered, and the doctors or therapists responsible for such a patient would generally respond to this behavior by "request[ing] a higher level of care." (R. 55–56.)  Dr. Efobi testified that the lowest level of care he would expect to see in cases of severe self-mutilating behavior would be an intensive outpatient treatment program, and in even more severe cases, he would expect to see ER visits followed by inpatient treatment for stabilization. (R. 56.)  Therefore, "if the symptoms were as severe as" Plaintiff claimed, "the average treating psychiatrist would . . . refer her to a high level of care, and I don't see that as discussion here." (R. 65.)  In addition, Dr. Efobi testified that, in reviewing the "process notes" regarding Plaintiff's treatment, he did not "see any concern that jumps out with regard to the therapist or the doctor when it comes to [Plaintiff's self-injurious]

behavior." (R. 56.)

Having reviewed the record, the Court finds it to be consistent with Dr. Efobi's testimony and conclusion that there was little evidence that Plaintiff's treating physicians were concerned with Plaintiff's level of care or that they were actively considering a higher level of care. The Court has only found a single indication that one of Plaintiff's treating physicians, Dr. Witek, may have contemplated a higher level of care for Plaintiff. (*See* R. 306.) The record shows that, in Dr. Witek's notes from the August 4, 2011 session with Plaintiff, Dr. Witek recommended consideration of an outpatient mental health treatment clinic. (R. 306.) However, there is nothing in the record to suggest that there was any further consideration regarding an outpatient clinic, nor was Plaintiff ever enrolled in such a clinic. Therefore, Dr. Efobi's testimony regarding the basis for his conclusion about the severity of Plaintiff's self-injurious behavior was consistent with the record.

**(2)   Severity of PTSD**

Plaintiff also argues that, although Dr. Efobi testified that Plaintiff's PTSD was of "questionable severity," the record "clearly document[s] the diagnostic criteria" of PTSD. (Pl. Mem. 22–23.) In response, the Commissioner argues that Dr. Efobi "did not question the diagnosis of PTSD," rather, he "questioned the severity of PTSD at step two of the sequential evaluation." (Comm'r Reply 6.)

During the administrative hearing, Dr. Efobi testified that he rated Plaintiff's difficulty maintaining concentration as "moderate" as of August of 2012 only, and that he otherwise rated it "mild," because while "there was mention of flashbacks in the record earlier" than August of 2012, "there was no evidence of [the flashbacks] being a problem until [the] therapy sessions [in August of 2012] started." (*See* R. 75–76.)

Having reviewed the record, the Court finds it to be consistent with Dr. Efobi's testimony that frequent flashbacks, or flooding, only emerged as a problem in or around August of 2012. During the administrative hearing, Plaintiff's representative argued that Dr. Efobi's testimony was at odds with the record based on a "comprehensive treatment plan" included among the Bleuler records and completed on or around November 30, 2011. (R. 75–76 (citing R. 507).) In the "comprehensive treatment plan," Plaintiff reported that her "long term objective" was to "work through traumatic memories in a safe manner to avoid flooding." (R. 507.) The reference to "flooding" in the "comprehensive treatment plan" does not alter the Court's conclusion that Dr. Efobi's testimony regarding the timing of the flooding experienced by Plaintiff was consistent with the record. While Plaintiff may have cited flooding as a concern on or around November 30, 2011, there is nothing in the record to suggest that she was actually experiencing flooding at a time other than the period in or around August of 2012. Therefore, Dr. Efobi's testimony regarding the basis for his conclusion as to the severity of Plaintiff's PTSD was consistent with the record as whole.

Thus, the ALJ did not err in relying on, and according "great weight" to, the testimony of medical expert Dr. Efobi.

### 5. Undated and unsigned form completed by Outreach Project

Plaintiff argues that the ALJ erred in according any weight to the undated and unsigned form completed by Outreach Project, to which the ALJ accorded "significant weight." (Pl. Mem. 25.) Plaintiff contends that the undated and unsigned form, which indicates that Plaintiff was "capable of performing job responsibilities," (R. 300), was "clearly not completed by Dr. Witek," (Pl. Mem. 25). Plaintiff further contends that the ALJ failed to recognize that the form was both undated and unsigned, and that "[a]s an unsigned, anonymous opinion there was no way for the ALJ to assess" the appropriate factors, such as "examining relationship," in

determining how much weight to give the form.  (*Id.*)

In response, the Commissioner concedes that the Outreach Project form was unsigned, but argues that "it is clear that the form was submitted from an individual at Outreach Project on October 3, 2011."  (Comm'r Reply 7.)  The Commissioner also argues that "the ALJ did not assess [the form] significant weight because he thought it was completed by Dr. Witek; rather, the ALJ found that the opinion was 'consistent with the evidence of record and made during the course of the claimant's rehabilitation program.'"  (*Id.* (citing R. 18).)  Finally, the Commissioner contends that the form is consistent with the Dr. Efobi's testimony and the findings and opinions of Drs. Kyle and Kudler.  (Comm'r Reply 7.)

While the last page of the undated and unsigned form completed by Outreach Project states "[p]lease have this form signed by a physician" and provides a space for a signature and the date of the form's completion, the last page of the form was left blank.  (R. 302.)  Although the form is undated, based on information provided in the responses, (R. 298 (indicating Plaintiff was discharged on Sept. 28, 2011)), and the apparent date on which Outreach Project faxed the partially completed form to the New York State Office of Temporary and Disability Assistance, (R. 294 (fax cover page dated Oct. 3, 2011)), it appears that the form was filled out in or around early October of 2011.  The responses to the form provide information about Plaintiff both at the time of her admission to Outreach Project in approximately December of 2010 and at the time of her discharge on or about September 28, 2011.  (*See* R. 298 (soliciting information regarding Plaintiff's "presenting problem"), 299–301 (soliciting information regarding Plaintiff's "most recent status examination" and "current functional assessment").)

The information provided about Plaintiff at the time of her admission is consistent with, and appears to be derived from, the information set forth in the initial psychiatric evaluation

completed by Dr. Witek on January 4, 2011. (*Compare* R. 298, *with* R. 315–16.) However, some of the information provided in response to the questions about Plaintiff's "most recent status examination" is inconsistent with the responses to the January 4, 2011 evaluation completed by Dr. Witek. (*Compare* R. 299 (indicating Plaintiff's insight and judgment were in tact), *with* R. 315 (indicating Plaintiff's insight and judgment were moderately impaired).) While the information provided in response to the questions about Plaintiff's "current functional assessment" is not necessarily inconsistent with the other records from Outreach Project, the basis for many of the responses in this section is unclear, including the response stating that Plaintiff "is capable of performing job responsibilities." (R. 300.) In addition, there are inconsistencies between these responses and the information provided in the July 21, 2011 psychiatric evaluation prepared by consultative examiner Dr. Kyle and the September 12, 2012 assessment by Dr. Caskey. (*Compare* R. 300–01, *with* R. 284–88, *and* R. 551–53.) For example, while the unsigned Outreach Project form indicates that there was no limitation to Plaintiff's "sustained concentration and persistence," (R. 301), Dr. Kyle opined that Plaintiff's ability to "maintain attention and concentration" was moderately impaired, (R. 287), and Dr. Caskey opined that Plaintiff's ability to "maintain attention and concentration" was moderately limited, (R. 551). While the Commissioner asserts that the unsigned Outreach Project form is consistent with the opinion of Dr. Kudler, the review examiner, Dr. Kudler's opinion was, in turn, based on the unsigned Outreach Project form. (*See* R. 496.)

Because the ALJ does not appear to have recognized that the Outreach Project form was undated and unsigned, and he did not address the inconsistencies between the Outreach Project form and the other evidence in the record, the ALJ erred in according "significant weight" to the Outreach Project form. As the Court is unable to determine that the ALJ's decision would have

been the same had the ALJ accorded less than "significant weight" to the unsigned Outreach Project form, the Court cannot conclude that the foregoing error was harmless. The case is therefore remanded so that the ALJ can ascertain who completed the unsigned Outreach Project form, the nature of that person's relationship with Plaintiff, and the exact date on which the form was completed. The ALJ is further directed to re-assess the weight accorded to the Outreach Project form in light of the foregoing information.

### 6. Dr. Kudler

Plaintiff argues that the ALJ erred in according "significant weight" to medical consultant Dr. Kudler's opinion. (Pl. Mem. 23.) As noted above, Dr. Kudler's opinion was largely based on the unsigned and undated Outreach Project form. (*See* R. 496.) Because the Court has remanded this case so that the ALJ may ascertain additional information regarding the Outreach Project form and reassess the weight to be accorded to that form, the Court directs the ALJ to reassess the weight assigned to Dr. Kudler's opinion in light of his reassessment as to the weight assigned to the Outreach Project form.

### III. Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied and Plaintiff's cross-motion for judgment on the pleadings is granted. The Commissioner's decision is vacated, and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 31, 2016
     Brooklyn, New York